11-1234, 11-1618
*Matusick v. Erie Cnty. Water Auth., et al.*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 4, 2012                                    Decided: January 3, 2014
                        Amended: February 25, 2014 )

Docket Nos. 11-1234, 11-1618

------------------------------------

SCOTT M. MATUSICK,

Plaintiff-Appellee-Cross-Appellant,

v.

ERIE COUNTY WATER AUTHORITY, GARY BLUMAN, Individually and in his
Official Capacity as Foreman, JOHN KURYAK, Individually and in his Official
Capacity as Distribution Engineer, JAMES P. LISINSKI, Individually and in his
Official Capacity as Coordinator of Employee Relations, ROBERT MENDEZ,
Individually and in his Official Capacity as Director of the Erie County Water
Authority,

Defendants-Appellants-Cross-Appellees.[*]

------------------------------------

Before:      SACK, RAGGI, and LOHIER, <u>Circuit Judges</u>.

---

[*] The Clerk of the Court is respectfully directed to amend the official
caption to appear as set forth above.

Appeal from judgments of the United States District Court for the

Western District of New York (Richard J. Arcara, <u>Judge</u>), after a jury trial, based

on, <u>inter alia</u>, the instruction to the jury not to give weight to administrative

findings, the jury's finding of liability on the plaintiff's state law discrimination

claims, the jury's finding of liability on the plaintiff's constitutional claims against

the municipal defendant, and the award of punitive damages against the

individual defendants.  The plaintiff cross-appeals, challenging the amount of the

district court's award of attorney's fees.  We conclude that the court correctly

decided that the administrative hearing officer's conclusions did not preclude the

jury from finding discriminatory conduct on the part of the defendants.  Insofar

as the district court may have erred in not instructing the jury on the preclusive

effect of the hearing or its evidentiary weight, such an error did not likely

influence the outcome of the proceedings and was therefore harmless.  The

plaintiff presented sufficient evidence for a reasonable jury to find, as this jury

did, that the defendants were liable on his state-law discrimination claims, and

the award of backpay is undisturbed.  Although the plaintiff sufficiently alleged a

constitutional violation, his relevant constitutional rights during the time in

question were not clearly established and therefore the individual defendants are

entitled to qualified immunity.  There was sufficient evidence presented to the

jury, however, for a reasonable fact-finder to determine, as the jury did, that the municipal defendant, the Erie County Water Authority, was liable on the plaintiff's claim under 42 U.S.C. § 1983. Accordingly, we vacate the award of punitive damages against the individual defendants, who were protected by qualified immunity, but affirm the finding of liability with respect to the Water Authority. Because Matusick was entitled as a matter of law at least to an award of nominal damages against the ECWA, however, we remand the cause for the limited purpose of requiring the district court to award such damages. Finally, we conclude that the district court did not abuse its discretion in awarding attorney's fees to the plaintiff in an amount substantially less than the amount claimed.

Affirmed in part; reversed in part; remanded in part. Judge Lohier concurs in the majority opinion and in a separate concurring opinion; Judge Raggi concurs in part and dissents in part.[**]

---

[**] After due consideration of the petitions for rehearing filed by the plaintiff and the ECWA, we deny the plaintiff's petition, and grant the ECWA's petition in part. We grant the ECWA's petition insofar as it concerns the reference in our original opinion to an award of punitive damages against the ECWA, and the basis for the district court's award of attorney's fees – issues addressed by the revisions in this amended opinion. We deny the remainder of the ECWA's petition.

3

HARVEY P. SANDERS, Sanders & Sanders, Cheektowaga N.Y., for Plaintiff-Appellee-Cross-Appellant.

JOSEPH S. BROWN (Adam W. Perry, Benjamin K. Ahlstrom on the brief), Hodgson Russ LLP, Buffalo, N.Y., for Defendants-Appellants-Cross-Appellees.

SACK, Circuit Judge:

## BACKGROUND

"When an appeal comes to us after a jury verdict, we view the facts of the case in the light most favorable to the prevailing party." Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 77 (2d Cir. 2006). We set forth the facts of this case in accordance with that requirement.

### Scott and Anita Matusick

Plaintiff Scott Matusick, who is white, was employed by the Erie County Water Authority ("ECWA") during 2004 when, he claims, he was assaulted, harassed, and ultimately terminated from his employment because of a romantic relationship he had with an African-American woman, Anita Starks -- now Anita Starks-Matusick. Starks and Matusick met in 2003 but, according to her trial testimony, did not begin dating until January or February 2004. They "became more serious" in March or April 2004: They became engaged. Trial Tr.

4

in <u>Matusick v. Erie County Water Auth.</u>, No. 07-cv-00489 (RJA)(HBS)(W.D.N.Y. 2010) ("Trial Tr."), Aug. 19, at 30.[1]  At this point, however, they did not share a residence -- Matusick lived in Hamburg, New York, and Starks lived in Niagara Falls, New York.  In 2005, after they became engaged, Starks moved into Matusick's house in Hamburg.  They were married in 2009.

Starks-Matusick has two children who were in their early teens when Starks and Matusick met and began dating.  <u>Id.</u> at 31.  According to trial testimony, the children had established a close relationship with Matusick.  Since 2005, and at least until the time of trial, they have lived with Starks/Starks-Matusick and Matusick in Hamburg.  <u>Id.</u> at 32.

<u>Discrimination at the ECWA</u>

The ECWA is an independent public benefit corporation and a New York State agency.  <u>See</u> N.Y. Pub. Auth. Law § 1050, <u>et seq.</u>  Its mission is to

---

[1]  The court identified Starks as Matusick's girlfriend during the charge to the jury, but the evidence shows that they were engaged to be married. According to Starks, "Scott came to my house, and . . . he didn't have a ring to put on my finger.  He did the one knee thing, but he didn't have a ring.  So I'm kind of looking at him like he's crazy, but I did say yes[.]"  Trial Tr., Aug. 19, at 30. Matusick testified at trial that he was in fact engaged.  When asked why he proposed if he "didn't have a ring," Matusick explained that his proposal was "spontaneous."  Trial Tr., Aug. 23, at 60.  We are aware of no evidence to the contrary.  We therefore treat their relationship as one of betrothal throughout this opinion.

provide a safe, reliable source of water to approximately 158,000 customers in and around Erie County, New York, which includes the City of Buffalo. In order to fulfill its mission, the ECWA operates a Service Center (the "Service Center") in Cheektowaga, New York, east of Buffalo. During 2004 and through 2006, the period relevant to this dispute, the ECWA had approximately 250 employees.

Matusick began working for the ECWA in June 1992. After several years, he held a position as a customer service representative, later becoming a bill collector, and still later, a dispatcher.[2]

During the summer of 2004, after Matusick and Starks became engaged, some of Matusick's coworkers at the ECWA became aware of his relationship with Starks. Many met Starks when, as was often the case, she

---

[2] According to Matusick, a dispatcher's duties include "answer[ing] emergency calls, . . . prepar[ing] work orders and excavation reports, . . . put[ting] together a packet for the foremen which will include valve ties for a shutdown and how to shut that down, [and] operating the radio so [the ECWA] ha[s] communication with the trucks out in the field . . . ." Trial Tr., Aug. 23, at 46. In conversations with Matusick, ECWA personnel described the dispatcher's position as "one of the most important jobs at the [ECWA]. It's what the public forms their perceptions about how good a job we are doing based upon the response time and level of professionalism and interface with the [d]ispatchers." Oct. 26, 2005, Interview by James R. Lisinski, ECWA Coordinator of Employee Relations, of Scott Matusick, filed as exhibit 15 to the May 11, 2009, Declaration of James R Lisinski, reprinted in the Court of Appeals Joint Appendix filed July 13, 2011, at 275. Matusick agreed with that statement. Id.

6

dropped Matusick off at work. Matusick testified at trial that Robert Mendez, the Director of the ECWA, was among the employees who saw Starks and was aware of her relationship with Matusick.

At about this time, Matusick's relationship with one of his supervisors, Gary Bluman, began to deteriorate. According to Matusick, Bluman was often a ring-leader when it came to harassing him on account of his romantic relationship with Starks. In 2004, according to Matusick, Bluman and his crew went onto Matusick's property, threw lawn equipment on his roof, and duct-taped his door shut. Matusick never reported this incident to anyone at the ECWA because, according to his trial testimony, Bluman had threatened to kill Matusick's family, and Matusick was afraid of what would happen if he reported Bluman to other supervisors.

Tension came to a head in July 2004. According to Matusick's testimony, during the morning of one of his shifts, Bluman entered the room where Matusick was working, "threw some papers in [Matusick's] face[, a]nd . . . said, you're going to do this, do this right fucking now." Id. at 66. Matusick apparently told Bluman that he would do what Bluman wanted in a "couple minutes," because he had yet to complete a project he owed one of the ECWA foremen. Id. According to Matusick's testimony, Bluman then "turned

7

[Matusick's] chair totally around so [Bluman] was facing [Matusick]. [Bluman] put a pen to [Matusick's] neck[,] . . . and he said, you're a fucking [nigger] lover, your -- your bitch is a[] [nigger], you're a fucking [nigger] now, too, and I'm going to kill all the fucking [niggers]." Id. at 66-67.[3]

Matusick reported the incident to Robert Guggemos and John Kuryak, supervisors at ECWA. He did not, however, formally report it to the human resources department. As a consequence of the incident, ECWA supervisors instructed Bluman to minimize his interactions with Matusick. Nonetheless, within a month and a half after the attack, Bluman resumed making racist comments.

Bluman was not the only one engaged in the harassment. Other employees, including James Lisinski, used the word "nigger" around Matusick,

---

[3] At trial, Matusick did not actually say the word "nigger" -- substituting, instead, "N" or "Ns," while noting that he "was not comfortable saying the real word [Bluman] said." Id. at 67.

Of course we share Matusick's discomfort. Its use in the context of this opinion serves to describe accurately the severity of the behavior to which Matusick was subjected at the ECWA, as found by the jury, and not to trivialize the word's significant –- and even unique -- power to offend, insult, and belittle. According to a Lexis search performed on May 27, 2013, this Circuit has used the term for similar purposes in at least fifty-five opinions. The most recent in a published opinion was in Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685(2d Cir. 2012).

despite the fact that he had made it clear -- although we doubt he had to -- that he found the word offensive. On one occasion during the summer of 2005, Lisinski remarkably, inasmuch as he was ECWA Coordinator of Employee Relations, told Matusick, "I'm going to get you, I'm going to get you, you [nigger] lover, you're going to get it." Id. at 93 (internal quotation marks omitted).

A co-worker, Brendan Finn, was, according to Matusick, even more persistently antagonistic. In the summer and fall of 2005, Finn made comments to Matusick such as, "[I]s your N[igger] bitch dropping you off [?]" Id. at 81. He also allegedly referred to Starks' children as "porch monkeys" or "nigglettes." Id. at 89, 95. In July 2005, Finn became irate when Matusick arrived late for work. Finn chased Matusick around the building, yelling something like, "now you're mother-fucking late like all the other [niggers], now you're a[] [nigger], too." Id. at 76.

Matusick reported this incident along with those involving Bluman and other ECWA employees to Guggemos and Kuryak but, once again, decided against taking his concerns to the human resources department. At trial he stated that he thought that there was no reason to make a formal complaint "[b]ecause [ECWA] supervisors said that they would handle the situation and they would take care of it and th[at] certain individuals would get a talking to and [the supervisors] would handle it." Id. at 101.

9

Other employees, including human resources staff, likely knew about Matusick's concerns, however. During an interview of Matusick regarding a disciplinary problem related to his covering-up a surveillance camera that had been placed in the dispatch office, Lisinski, himself an alleged offender, asked "what is this I'm hearing about you disrupting the work force and talking about, you know, black –- black issues, white issues, sexual harassment, and so on and so forth[?]"[4] Id. at 91.

Matusick's Disciplinary Problems and Termination

The heart of the factual dispute in this case is whether Matusick's treatment by the ECWA was motivated in significant part by discriminatory intent or whether it was purely a consequence of his failure to perform his duties as a dispatcher. To support their position at trial, the defendants introduced evidence regarding Matusick's long and serious history of disciplinary problems.

On October 26, 1997, the Commissioner of the ECWA visited the Service Center to find Matusick watching television, as the Commissioner later reported in a memorandum. Joint Appendix filed in this Court on July 13, 2011

_____

[4] Matusick also testified about the ECWA's training and policy materials related to discrimination in the workplace. Although the ECWA apparently has detailed policies on "employee relations," including "equal employment opportunity" and "complaint resolution," none of these policies were made available to Matusick during his tenure at the ECWA. Id. at 98-99.

10

("J.A.") 3799.[5]  In April 2005, Matusick intentionally blocked a video camera in the

dispatch office, which was installed after September 11, 2001, ostensibly for the

purpose of protecting the safety of the water supply.  But it also served to record

the conduct of dispatchers while at work.

Matusick admitted to blocking the camera by placing various objects

in front of it on between ten and twenty occasions.  In May 2005, he was served

with disciplinary charges under section 75 of the New York State Civil Service

Law related to this incident.[6]  He admitted his guilt of all camera-blocking

---

[5]  In the memorandum, he reported that when he arrived, he found
"Matusick slouched in the dispatcher's chair loudly engaged in a football game he
was watching on the overheard TV. . . .  [Matusick] jumped-up and looked out
the window as he screamed out 'what kind of an asshole would call during the
fourth quarter of the game.'" J.A. 3799.  Matusick had apparently been watching
a now notorious Buffalo Bills game.  See Mark Gaughan, Bills Battle Broncos to
the Bitter End, BUFFALO NEWS, Oct. 27, 1997, at S3 (reporting that the Bills came
back from a 20-0 deficit in the fourth quarter, but ultimately lost on a field goal
with 1:56 remaining in overtime).

[6]  State employees covered by section 75 "shall not be removed or
otherwise subjected to any disciplinary penalty provided in this section except
for incompetency or misconduct shown after a hearing upon stated charges
pursuant to this section."  N.Y. Civ. Serv. Law § 75(1).  The section outlines the
hearing process and its relationship to the termination of a public employee,
including that the employee will have written notice of the hearing and the
charges and time to answer. Id. § 75(2).

We have decided that, even though section 75 only provides a hearing
officer's recommendation, which can then either be accepted or rejected by an
agency head, the provision "gives covered employees a property interest in their
employment, so that they may not be terminated without notice and hearing."
O'Neill v. City of Auburn, 23 F.3d 685, 688 (2d Cir. 1994).

charges, accepting a 60 day suspension without pay.

To support its position that Matusick's discipline was not discriminatory, the ECWA points to the fact that other ECWA employees were similarly disciplined for blocking the video camera. For example, Joe Marzec, who worked as a duty-man on the night-shift with Matusick, also conceded guilt to a similar charge and accepted a 30-day suspension without pay. Thomas Radich, a control room operator, also admitted his guilt, accepting a 90-day suspension without pay.

Matusick faced more disciplinary charges in November 2005. The ECWA alleged that on October 1 and 20, 2005, Matusick had "failed to properly respond to information, failed to dispatch workers to the scene of water line breaks in a timely manner, and slept on duty." Decl. of James R. Lisinski at ¶ 32, J.A. 1306.

After the charges were filed, the ECWA held a section 75 hearing presided over by Michael Lewandowski, an independent hearing officer selected by the ECWA. The hearing was held intermittently on five non-consecutive days between December 2005 and February 2006. Matusick was formally represented by his union representatives. His father, a lawyer, was also present on all hearing dates.

On April 7, 2006, the hearing officer issued a 25-page Report and Recommendation.  Id. at ¶¶ 52-57, J.A. 1309; see also Report and Recommendation, J.A. 1482-1506.  The hearing officer began his factual analysis by noting that the "videotapes of the surveillance camera in the Dispatch office for the dates of October 1, 2005, and October 20, 2005, were not offered into evidence upon the claim of the [ECWA] that the tapes had been automatically recorded over."  J.A. 1487.  At the heart of Matusick's argument before the section 75 hearing officer was the assertion that "the tapes would provide conclusive evidence that the claims made against him [were] false."  Id.  The hearing officer rejected Matusick's spoliation argument, concluding that the tapes would be unlikely to provide dispositive evidence of guilt or innocence, and that he, the hearing officer, could reach proper conclusions based on testimonial and documentary evidence in the record.  Id. at 1488.

Ultimately, the hearing officer found Matusick guilty of several of the charges against him.  For example, the officer concluded that in the early morning hours of October 1, 2005, Matusick failed to respond to reports of a water-line break for more than an hour.  He also found that Matusick had slept while on duty as a dispatcher on October 1, 2005.  And the officer found that Matusick had failed to respond to reports of a water-line break on October 20, 2005, for almost four hours before –- after receiving three calls from residents –-

13

finally dispatching an engineer.

The hearing officer recommended Matusick's dismissal, in light of his continued misconduct and the threat it caused to the integrity of the County's water system. J.A. 1505.

Matusick never expressly argued to the hearing officer that he was treated adversely because of his relationship with Starks. In his Report and Recommendation, the hearing officer did comment on the possibility of disparate treatment when it came to pursuing disciplinary charges for sleeping while on duty at the ECWA: "[Matusick] argues that the evidence . . . shows that employees sleep on the job without consequence therefore it would be disparate treatment to impose [a] penalty on [Matusick] for similar conduct. That argument falls short because while [evidence supports the assertion that] co-workers [were sleeping on the job]," there was no evidence that management was aware of it. J.A. 1497. The hearing officer did not suggest, however, that Matusick had specifically argued that discrimination on the basis of his romantic relationship with an African-American woman was the reason for his alleged disparate treatment.

On April 24, 2006, Mendez adopted the recommendation of the hearing officer on behalf of the ECWA and formally terminated Matusick. Mendez, the Director of the ECWA, testified at trial that the sole basis for the

14

termination was the Report and Recommendation.

Procedural History

On June 26, 2007, Matusick filed a complaint in State Supreme Court, Erie County, against the ECWA and ten individual defendants: (1) Robert Mendez, Director of the ECWA; (2) Gary Bluman, ECWA foreman; (3) John Kuryak, an ECWA Distribution Engineer; (4) James Lisinski, Coordinator of Employee Relations; (5) David F. Jaros, Senior Distribution Engineer; (6) Karla Thomas, a director of Human Resources; (7) Helen Cullinan Szvoren, also a director of Human Resources; (8) Matthew J. Baudo, Secretary to the ECWA; (9) Robert Guggemos, an ECWA Distribution Engineer; and (10) Joseph Marzec, another employee of the ECWA.

The complaint contained six claims. First, it asserted one for physical assault and battery against Bluman individually. Second, it set forth a claim for unlawful discrimination and hostile work environment against the ECWA and each of the individual defendants in violation of New York Executive Law § 296(1)(a) ("It shall be an unlawful discriminatory practice . . . [f]or an employer . . . , because of an individual's . . . race . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."). Third, it made a claim under the same section for disparate treatment resulting in

15

discipline and termination. Fourth, also under the same section, it asserted a claim for retaliation in violation of state law. Fifth, it asserted a claim under 42 U.S.C. § 1983, alleging that while acting under color of state law the defendants deprived Matusick of his First and Fourteenth Amendment rights under the United States Constitution. Finally, the complaint asserted a claim under New York State law for intentional infliction of emotional distress against all defendants.

On July 27, 2007, the ECWA removed the case to the United States District Court for the Western District of New York under 28 U.S.C. § 1331 and § 1441 on the grounds that the complaint asserted a claim arising under federal law: the claim under 42 U.S.C. § 1983.

After discovery, the defendants moved for summary judgment on all claims. On February 22, 2010, Magistrate Judge Hugh B. Scott, to whom the matter had been referred by the district court judge, issued a Report and Recommendation recommending that the motion be denied in part and granted in part. Matusick v. Erie Cnty. Water Auth., No. 07-cv-489A, 2010 WL 2431077, 2010 U.S. Dist. LEXIS 144193 (W.D.N.Y. Feb. 22, 2010).

First, the magistrate judge recommended denial of the defendants' motion for summary judgment with regard to Matusick's constitutional claims. See id. at *7-*11, 2010 U.S. Dist. LEXIS 144193, at *28-*43. In doing so, he agreed

16

with Matusick's assertions that: (1) he had a constitutional right under both the First and Fourteenth Amendments to maintain a romantic relationship with Starks, see id. at *8, 2010 U.S. Dist. LEXIS 144193, at *34; and (2) a reasonable jury could conclude that the ECWA itself was subject to liability under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), because the abuse and harassment alleged by Matusick, "if accepted by a trier of fact, is sufficient to establish a custom or practice that is so pervasive and widespread that the ECWA had either actual or constructive knowledge of it." Matusick, 2010 WL 2431077, at *9, 2010 U.S. Dist. LEXIS 144193, at *36.

Second, the magistrate judge recommended that the district court deny the defendants' motion as to Matusick's disparate treatment claim under state law arising from his termination, but that it grant summary judgment as to any disparate treatment claim arising from Matusick's May 2005 suspension. With respect to the suspension, the magistrate judge concluded that "[t]he plaintiff has failed to adequately articulate a basis to distinguish the discipline he received with the discipline received by" similarly situated fellow employees. Id. at *12, 2010 U.S. Dist. LEXIS 144193, at *48. With regard to the termination, however, the magistrate judge reasoned that Matusick had "sufficiently articulate[d] a basis that would allow a rational factfinder to conclude that the proffered reason for Matusic[k]'s termination was not the true reason," and that

17

Matusick was not precluded from bringing this claim because of the resolution of the section 75 hearing concluding that there was a basis for his termination. Id. at *13, 2010 U.S. Dist. LEXIS 144193, at *49-*50.

Finally, with respect to the claim of the maintenance or tolerance of a "hostile work environment" contrary to New York law, the magistrate judge again reasoned that if a trier of fact were to accept Matusick's allegations of serious and sustained harassment, then he would have made out a viable hostile work environment claim. Id. at *14, 2010 U.S. Dist. LEXIS 144193, at *53. The magistrate judge recommended dismissal of the plaintiff's "intentional infliction of emotional distress claim" against the defendants and "physical assault and battery" claim against Bluman individually, however, because these claims were barred by the statute of limitations. See id. at *13-*14, 2010 U.S. Dist. LEXIS 144193, at *51-*54.

On June 11, 2010, the district court (Richard J. Arcara, Judge) adopted the magistrate judge's recommendations in their entirety. The case proceeded to trial against all of the defendants named in the original complaint.

* * *

During the course of the trial, the parties debated the role that the hearing officer's determinations following the section 75 hearing should play in the jury's resolution of the case. Although the district court had accepted the

18

magistrate judge's recommended conclusion that the section 75 hearing did not preclude Matusick's discrimination claims, the court allowed the defendants to present evidence to the jury regarding the hearing process, including that the hearings involved an "independent hearing officer hold[ing] a session, much like court here." Trial Tr. Aug. 26, at 149. Mendez testified that the report and recommendation from the section 75 hearing officer concerning Matusick's disciplinary problems was "the strongest . . . report and recommendation that I've ever had towards a termination of an employee." Id. at 162. The jury also saw the ECWA document, signed by Mendez, adopting the report and recommendation. The court did not permit the defendants to put into evidence the written report and recommendation by the ECWA hearing officer, however, and it prohibited Mendez from testifying as to the specific information in the report.

The court also explained the role of the report and recommendation in its charge to the jury, stating that they did not bind the jury or force it "in any way to reach a particular outcome on plaintiff's unlawful termination claim," the central element of which was whether Matusick's interracial relationship was a motivating factor in his termination. Trial Tr., Aug. 31, at 104-05.

At the close of evidence, the defendants made a motion for judgment as a matter of law. See Matusick v. Erie Cnty. Water Auth., 774 F. Supp. 2d 514,

19

519 (W.D.N.Y. 2011) ("Post-Trial Order"). The district court granted that motion with respect to defendants Jaros, Thomas, Szvoren, Baudo, and Guggemos, and with respect to some of the claims against Mendez and Bluman, neither of whom were involved in formulating disciplinary charges against Matusick. See id. at 519. The remaining claims proceeded to verdict.

The jury returned a verdict finding the ECWA, Kuryak, and Lisinski liable for unlawful termination; the ECWA, Bluman, Kuryak, and Lisinski liable for the maintenance or tolerance of a "hostile work environment"; and the ECWA, Mendez, Bluman, Kuryak, and Lisinski liable for violation of 42 U.S.C. § 1983. The jury awarded Matusick $304,775 in back pay on the state unlawful termination claims, and $5,000 in punitive damages against each individual defendant on the section 1983 claims.[7] Id. at 520.

The defendants, including the ECWA, filed post-trial motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b), and for a correction of the final judgment in the event that the judgment survived the 50(b) motion. See id. at 517-18.

The defendants argued that the jury's verdict on the unlawful termination claim could not stand as to any of the defendants held liable for that claim, and therefore that the award of backpay should be vacated. See id. at 520.

_____

[7] The jury did not award damages on the hostile work environment claim, and the finding of liability on that claim is not on appeal here.

20

At the heart of this assertion was the argument, reasserted here on appeal, that Matusick could not "compare himself to other employees because his disciplinary history was different and because he declined an invitation to settle the charges that led to his Section 75 hearing." Id. Further, they asserted that "the race of plaintiff's then-girlfriend [sic] was not a motivating factor behind plaintiff's termination because the weight of the evidence indicates that no one in a position to make or to contribute to the decision to terminate knew about the relationship." Id.

The district court expressed skepticism about the defendants' arguments:

> As for plaintiff's evidence that race was a motivating factor behind his termination, the Court is concerned that defendants' remaining arguments are simply an invitation to disbelieve plaintiff and to believe other witnesses. . . . Viewing the evidence in the light most favorable to plaintiff, plaintiff submitted evidence acceptable to a reasonable jury that defendants -- directly or by aiding and abetting -- terminated plaintiff and disciplined him more harshly than they would have otherwise because of animosity toward his interracial relationship.

Id. at 521.

The court also considered the defendants' argument that the section 75 hearing should preclude the plaintiff from re-litigating his discrimination claim because the hearing resolved in the defendants' favor the question of whether there were legitimate bases for Matusick's termination. See id. at 520-21.

21

The district court rejected this argument, concluding that the hearing officer never finally decided that the plaintiff should be terminated; he only recommended that course of action. It was Mendez who ultimately decided to adopt the hearing officer's recommendation and terminate Matusick. Id. at 521.

The district court then considered objections by the defendants related to the plaintiff's section 1983 claims, and the award of punitive damages arising from them. The court had concluded prior to trial that the plaintiff had a valid section 1983 claim, and that the individual defendants did not enjoy qualified immunity with respect to it. After trial, the court considered the defendants' assertion that the individual defendants could not be held liable under a theory of supervisory liability. Id. at 522.

The district court dismissed this argument, noting its "concern[] that defendants have overlooked the evidence that emerged at trial in pursuit of a technical and unsettled legal point." Id. The crux of the defendants' position rested on the argument that the Supreme Court's then-recent decision in Ashcroft v. Iqbal, 556 U.S. 662 (2009), made clear that under section 1983, "'masters do not answer for the torts of their servants,'" and therefore that "'each Government official, his or her title notwithstanding, is only liable for his or her own misconduct.'" Matusick, 744 F. Supp. 2d at 522 (quoting Iqbal, 556 U.S. at 677). The district court concluded, however, that despite this evolving legal doctrine,

22

"a reasonable jury could have credited the evidence that the individual defendants actively participated in racial slurs and actively cast plaintiff, and not themselves, as a disruptive member of the ECWA workforce because he complained about racial harassment." Id. at 522.

In considering the defendants' qualified immunity argument, the court did not focus on the defendants' assertion that they were entitled to protection because it was not clearly established that the plaintiff's betrothal relationship was protected by the First Amendment[8] at the time of the incidents. Instead, the court said that "the very first step in assessing a claim for qualified immunity is to identify the discretionary governmental function that required the conduct that a plaintiff claims to be improper." Id. at 525 (citing Scott v. Fischer, 616 F.3d 100, 105 (2d Cir. 2010)). "Critical to . . . qualified immunity cases . . . is that the governmental conduct that is allegedly improper has to match the governmental function that would receive immunity from liability." Id. There was no governmental function that could require the substantial derision the

_____

[8] As discussed at greater length in section II.A.3.a below, whether the intimate association right arises under the First or Fourteenth Amendment has not yet been authoritatively settled. See Adler v. Pataki, 185 F.3d 35, 42-44 (2d Cir. 1999) (discussing cases that frame the right either as an implied First Amendment right or as a fundamental liberty protected by the Due Process Clause of the Fourteenth Amendment).

plaintiff faced while working at the ECWA, and therefore, according to the district court, the defendants could not raise a qualified immunity defense. See id.

Having left the jury's findings on liability undisturbed, the court then addressed whether the jury's award of punitive damages on the section 1983 claim was reasonable in light of the violations at issue. Once again, the court concluded that "a reasonable jury could have decided based on the evidence that defendants were liable under Section 1983 for intentional racial harassment designed to punish plaintiff for his interracial relationship." Id. at 526-27.

The defendants appeal.

## DISCUSSION

I.    The Import of the Section 75 Hearing

Many of the defendants' arguments on appeal challenge the district court's treatment of the section 75 hearing before, during, and after trial. As discussed above, the court (1) adopted the magistrate judge's determination that the hearing officer's findings did not preclude the plaintiff's claims, and repeated that conclusion after trial; (2) instructed the jury that the section 75 hearing did not "force" the jury to resolve any of the questions before it in any particular way; and (3) did not allow the hearing officer's written recommendation into evidence. The defendants dispute all three of these decisions. We conclude that even if the

24

district court erred as a legal matter in instructing the jury on the preclusive effect of the recommendation, this error was harmless and does not require vacatur. See Fed. R. Civ. P. 61.

## A.    Issue Preclusion

Whether the hearing officer's fact-findings that there was a sufficient and legitimate basis for Matusick's termination precluded the plaintiff from relitigating those issues in the district court is a question of law.  We review the district court's answers to such questions de novo.  See, e.g., United States v. Selioutsky, 409 F.3d 114, 119 (2d Cir. 2005).

State law governs the preclusive effects in federal court of a state administrative agency's quasi-judicial findings.  Univ. of Tenn. v. Elliott, 478 U.S. 788, 796-99 (1986); see also Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 81 (1984); Kosakow v. New Rochelle Radiology Assocs., P.C., 274 F.3d 706, 728 (2d Cir. 2001) (similar).

"New York courts give quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate." Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist., 411 F.3d 306, 310 (2d Cir.), cert. denied, 546 U.S. 1062 (2005).  This rule applies to findings made by administrative officers after conducting section 75 hearings.  See, e.g., In

re Cheeseboro, 84 A.D.3d 1635, 1636, 923 N.Y.S.2d 772, 773 (3d Dep't 2011) (deciding that a finding of fact by a section 75 hearing officer that unemployment-insurance applicant had been terminated from prior employment for cause had preclusive effect with regard to a denial of a benefits application).

Like a prior judicial finding of fact, in order to have preclusive effect over a subsequent fact-finding or legal analysis, a prior administrative determination must have resolved the identical issue, and the issue must have been actually and finally decided in the prior adjudication. See Restatement (Second) of Judgments § 27 (1982).[9] But even if an identical issue was necessarily decided in the prior proceeding, issue preclusion does not apply unless there was "a full and fair opportunity [for the party against whom preclusion is sought] to contest the decision now said to be controlling." Buechel v. Bain, 97 N.Y.2d 295, 304, 766 N.E.2d 914, 919, 740 N.Y.S.2d 252, 257 (2001).

1.  Finally Decided.  The district court's preclusion analysis did not proceed beyond its observation that the report and recommendation of the hearing officer was a "non-binding recommendation[] regarding plaintiff's

---

[9] The "identical issue necessarily decided" requirement under New York law comprises two parts: (1) the issues of both proceedings must be identical, and (2) the issue must have been raised, necessarily decided, and material to the first action.  Leather v. Eyck, 180 F.3d 420, 425–26 (2d Cir. 1999), cert. denied, 533 U.S. 941 (2001) (alterations omitted).

termination," which was therefore not a final decision on the merits and could not have preclusive effect.  Matusick, 774 F. Supp. 2d at 521.

To support this conclusion, the district court relied on our decision in Leventhal v. Knapek, 266 F.3d 64, 72 (2d Cir. 2001).  There, we considered the preclusive effect of a finding by a section 75 hearing officer employed by the New York State Department of Transportation (the "DOT") that the Department had violated the Fourth Amendment rights of one of its employees by searching his workplace computer to discover whether he had installed unlicensed software.  See id. at 69-70.  We concluded that this determination did not preclude the subsequent reexamination by the district court of the employee's Fourth Amendment argument asserted through a section 1983 claim, because a final determination had not been made by the Commissioner of the DOT.  See id. at 72.

The district court's reliance on Leventhal is misplaced.  In that case, there was no final decision both because the parties settled before the hearing officer had taken all of the evidence and because the DOT Commissioner had not adopted any recommendations of the hearing officer.  Id.

In this case, however, the ECWA did adopt the recommendations of the hearing officer.  And, therefore, that recommendation became the official decision of the agency.  The case at bar is thus no different from other cases in

27

which New York courts have granted preclusive effect to section 75 recommendations later adopted by the state agency. See, e.g., In re Agran, 54 A.D.3d 479, 479-80, 863 N.Y.S.2d 295, 296 (3d Dep't 2008); In re Dimps, 274 A.D.2d 625, 626, 710 N.Y.S.2d 448, 449-50 (3d Dep't 2000). This is so even though Matusick decided not to challenge the determination in state court, as he was entitled to do. See Harris v. Israel, 95 A.D.3d 1117, 1117, 943 N.Y.S.2d 901, 902 (2d Dep't 2012) (review of section 75 proceeding finding petitioner, former state employee, guilty of misconduct and insubordination); see also Doe v. Pfrommer, 148 F.3d 73, 79-80 (2d Cir. 1998) (issue preclusion applies to unreviewed state agency determinations).[10]

       2. Identicality of Issues. We must therefore address what we think to be a more difficult question -- whether any of the issues decided by the hearing officer are identical to issues decided by the jury and therefore preclusive of issues that must be decided in order to resolve this dispute.

---

[10] Matusick also argues that the section 75 hearing officer's recommendations are not preclusive because he was not represented by counsel. This argument is meritless. New York courts have held that as long as the section 75 respondent is represented by a union official, as Matusick was here, the results of that hearing can have preclusive effect. See Ryan v. N.Y. Tel. Co., 62 N.Y.2d 494, 503-04, 467 N.E.2d 487, 492, 478 N.Y.S.2d 823, 828 (1984). Indeed, section 75 proceedings can be preclusive even where the respondent elected not to appear at all. See In re Agran, 54 A.D.3d at 479-80, 83 N.Y.S. at 295.

As an initial matter, the district court correctly concluded that the hearing officer's determination that Matusick had engaged in the charged conduct, and that these violations called for his termination, does not preclude a jury from later finding that Matusick was also terminated at least in part because of his relationship with Starks. The plaintiff could be successful on the state anti-discrimination claims or the section 1983 claims even if the jury were to accept that there were legitimate reasons for terminating him, too.

The "standards for recovery" under the New York State Human Rights law anti-discrimination provisions "are in accord with Federal standards under [T]itle VII of the Civil Rights Act of 1964." Ferrante v. Am. Lung Ass'n, 90 N.Y.2d 623, 629, 687 N.E.2d 1308, 1312, 665 N.Y.S.2d 25, 28 (1997). Under these standards, a plaintiff claiming that he was discriminated against on an impermissible basis must demonstrate (1) that he is a member of the class protected by the statute; (2) that he was qualified for the position; (3) that he experienced an adverse employment action; and (4) that this adverse employment action occurred under circumstances giving rise to an inference of discrimination. See, e.g., McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011). "Once th[is] prima facie case has been shown, the burden then must shift to the employer to

articulate some legitimate, nondiscriminatory reason for the adverse employment action.  The burden then shifts back to the plaintiff to show that the defendant's stated reason for the adverse employment action was in fact pretext."  Brennan, 650 F.3d at 93 (quoting McDonnell Douglas, 411 U.S. at 802) (internal quotation marks and alterations omitted).  Even if the factfinder decides that the defendants terminated the plaintiff in part for legitimate reasons, the plaintiff may prevail on his or her claim if he or she can demonstrate that his or her employer was motivated, at least in part, by discriminatory purposes.  See Nelson v. HSBC Bank USA, 41 A.D.3d 445, 446-47, 837 N.Y.S.2d 712, 714 (2d Dep't  2007).

Although a First Amendment retaliation claim under section 1983 is not evaluated using the McDonnell Douglas burden-shifting methodology, it too involves consideration of whether the plaintiff experienced an adverse action related to his or her employment as a result of protected conduct as opposed to alternative, legitimate, work-related reasons.  "To succeed on . . . First Amendment claims, [the plaintiff] must demonstrate by a preponderance of the evidence that the [conduct] at issue was protected, that he suffered an adverse employment action, and that there was a causal connection between the protected [conduct] and the adverse employment action."  Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir. 1994).  "Should a plaintiff demonstrate these factors, the

defendant has the opportunity to demonstrate by a preponderance of the evidence that it would have undertaken the same adverse employment action even in the absence of the protected conduct." Id. (internal quotation marks omitted). The plaintiff may prevail on his section 1983 claim if he can show that the defendants would not have implemented the same adverse employment actions were it not for their discriminatory motivations. See Adler v. Pataki, 185 F.3d 35, 47 (2d Cir. 1999).

The issue decided by the hearing officer after the section 75 hearing related to the ECWA's articulated basis for Matusick's termination. As noted, however, there is no indication that the hearing officer was ever presented with evidence that the charges against Matusick were motivated, even in part, by an intent to discriminate, which is at the heart of the disparate treatment claims here. Nor is there any indication that if the hearing officer had heard this evidence, it would have been within his statutorily defined authority to review that allegation, or that he would have found that Matusick's termination was warranted.[11] Therefore, the hearing officer's factual determinations were not

---

[11] A section 75 hearing officer's sole responsibility is to consider whether the state employee facing charges has been "incompeten[t] or [committed] misconduct." See N.Y. Civ. Serv. Law § 75(1).

31

identical to the issues of fact presented to the jury for its determination.[12] <u>See</u>

<u>Burkybile</u>, 411 F.3d at 313 ("The record does not reflect that any constitutional

claims were raised at the Section 3020-a hearing, so we do not take these as

decided."); <u>see also</u> <u>Senno v. Elmsford Union Free Sch. Dist.</u>, 812 F. Supp. 2d 454,

472 (S.D.N.Y. 2011) ("[A] finding that [p]laintiff was terminated for cause does

not bar [p]laintiff's Title VII claim.  Even if [p]laintiff cannot dispute the factual

findings of the Hearing Officer's decision, [p]laintiff can still prevail if he shows

that [d]efendants acted with an improper motive in bringing charges against

[p]laintiff.").

But the hearing officer did make findings of fact that bear on the

issues raised on appeal –- he found that Matusick had actually committed

misconduct and that his conduct at work evinced an incompetence and

---

[12] Of course, as is the case here, whether or not an issue decided in a prior proceeding is identical to an issue at stake in a subsequent proceeding is often a corollary of the question whether or not the issue in question in the second proceeding was "actually litigated" in the prior proceeding.  <u>See, e.g.</u>, WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4417 n. 9 (citing <u>Faigin v. Kelly</u>, 184 F.3d 67, 77-79 (1st Cir. 1999) (issues were not identical and, as a corollary, the issue at stake in the subsequent litigation was not actually litigated in the prior)).  Here for example, the fact that the hearing officer never heard evidence of discrimination directly supports the conclusion that that question was never actually litigated below, and confirms that there was no identicality of issues between the administrative hearing focused on Matusick's misconduct and the litigation concerning discrimination on the basis of the race of Matusick's romantic partner.

carelessness not befitting his role as a dispatcher for a water authority. The

question we must address, then, is what the preclusive effects of these findings

are. And that question turns on what the Restatement (Second) of Judgments

refers to as "[o]ne of the most difficult problems in the application of [collateral

estoppel is] . . . [the] delineat[ion] [of] the issue on which litigation is, or is not,

foreclosed by the prior judgment." RESTATEMENT (SECOND) OF JUDGMENTS § 27

cmt. c. (1982).

Critical to the resolution of the question is the determination of

whether the "issue" that is identical in the two proceedings involves a factual or

legal determination. As one federal district court explained:

> An issue is a single, certain and material point arising out of
> the allegations and contentions of the parties. It may concern
> only the existence or non-existence of certain facts, or it may
> concern the legal significance of those facts. If the issues are
> merely [factual], they need only deal with the same past
> events to be considered identical. However, if they concern
> the legal significance of those facts, the legal standards to be
> applied must also be identical; different legal standards as
> applied to the same set of facts create different issues.

Overseas Motors, Inc. v. Import Motors Ltd., 375 F. Supp. 499, 518 n.66a (D.

Mich.), aff'd, 519 F.2d 119 (6th Cir. 1974), cert. denied, 423 U.S. 987 (1975)

(internal quotation marks omitted).

The hearing officer's ultimate conclusions -- that Matusick had

committed disciplinable misconduct and was incompetent -- were guided by the

particular legal framework and standards applicable in section 75 proceedings. See, e.g., Peters v. Cnty. of Rensselaer, 28 A.D.3d 854, 854, 811 N.Y.S.2d 811, 812-13 (3d Dep't 2006) (deciding that under New York's Civil Service Law, there was substantial support for section 75 hearing officer's determination that petitioner, a maintenance worker at a local community college, committed disciplinable misconduct when, during his work shift, he sat in a truck reading a newspaper and smoking). The section 75 framework differs substantially from the legal framework for state and federal employment discrimination law applicable to Matusick's federal jury trial. The hearing officer's conclusions about the significance of Matusick's misconduct and incompetence for purposes of section 75, therefore, are not preclusive of any findings that the jury could have made in the course of their deliberations with respect to the reasons for Matusick's termination. Cf. Swineford v. Snyder Cnty. Pa., 15 F.3d 1258, 1268 (3d Cir. 1994) (concluding that administrative determination that plaintiff had not violated company rules for the purposes of determining whether she was eligible for unemployment benefits was not preclusive of employer's argument that plaintiff was fired for legitimate reasons and not as retaliation for the exercise of her First Amendment rights). In particular, the hearing officer's conclusions did not

preclude the jury from finding that Matusick was terminated in substantial part because of his relationship with Starks.

The <u>factual</u> findings supporting the hearing officer's ultimate conclusion -- that Matusick had indeed committed the charged conduct, <u>i.e.</u>, that he had failed to respond to calls and slept on duty -- are of a different nature. These findings precluded Matusick from arguing otherwise at trial.  See <u>Klein v. Perry</u>, 216 F.3d 571, 574 (7th Cir. 2000) (observing that, under Indiana Law, an issue of fact determined by state agency adjudicator is preclusive of subsequent factual findings in a civil rights dispute in federal court, even if those findings are embedded within a different legal claim).  Therefore, in the course of deciding –- both under state law and for the section 1983 claims –- whether the defendants terminated Matusick for legitimate or illegal reasons, the jury was required to accept that Matusick had failed to perform -- satisfactorily, if at all -- some of his duties at the ECWA.  <u>See, e.g.</u>, <u>Burkybile</u>, 411 F.3d at 309-314 (deciding that, when applying federal constitutional standards in determining whether a genuine issue of material fact existed, we accept the fact-findings of the hearing officer in the course of our examination of the federal constitutional claim).

Applying these principles to this case, we conclude that the jury was precluded from finding that Matusick had not actually engaged in the conduct

charged against him in the section 75 hearing. Inasmuch as the district court did not expressly instruct the jury that its fact-findings were cabined in this regard, the jury charge was in error.

**B.** **The Admissibility and Persuasiveness of the Section 75 Report and Recommendation**

The defendants also assert two other arguments related to the court's treatment of the section 75 hearing officer's determination.

First, they dispute the court's decision not to instruct the jury that it could find the <u>fact</u> that the hearing officer issued the report and recommendation to be evidence that the defendants terminated Matusick for legitimate reasons.[13] This argument is rooted in our opinion in <u>Ruiz v. County of Rockland</u>, 609 F.3d 486 (2d Cir. 2010), and our summary order in <u>Testagrose v. New York City Housing Authority</u>, 369 F. App'x 231 (2d Cir. 2010).

In <u>Ruiz</u>, we considered a former state employee's Title VII and Equal Protection Clause claims against his former employer who had claimed that the

---

[13] The defendants assert at various points in their briefing that the district court instructed the jury that the hearing officer's report and recommendation was "not entitled to any weight." <u>See, e.g.</u>, Defs. Reply and Response Br. at 11. This framing appears to be a mischaracterization of the jury charge. The court's instruction on the section 75 hearing focused on the fact that the outcome of that hearing did not force the jury to arrive at any particular decision with regard to the plaintiff's wrongful termination claim, not on the evidentiary weight of the hearing officer's determinations.

plaintiff was terminated as a consequence of misconduct, not his protected status, and that this misconduct was found after a section 75 disciplinary hearing. Ruiz, 609 F.3d at 490. We concluded that, together with other evidence, the fact that the hearing officer had recommended termination supported the defendants' arguments that the plaintiff was terminated for legitimate reasons rather than inappropriate discrimination. See id. at 494 ("[F]indings of fact made by a neutral decision-maker have 'probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive.'" (Quoting Collins v. N.Y.C. Transit Auth., 305 F.3d 113, 115 (2d Cir. 2002))). The crux of the defendants' argument, then, appears to be that the jury should have been expressly instructed that the <u>fact</u> that the hearing officer made the determination was probative of the defendants' assertion that Matusick was terminated for legitimate reasons.

Second, the defendants dispute the district court's evidentiary rulings to exclude the actual report and recommendation as documentary evidence of the hearing officer's conclusions.

We need not, however, address either of these arguments. Even if the district court erred in any of the ways that the defendants allege, as we will explain, neither these errors nor the decision not to instruct the jury on the

potential preclusive effect of the section 75 hearing were materially prejudicial to the defendants.

## C. Harmless Error

Under Federal Rule of Civil Procedure 61, courts are instructed to "disregard all errors and defects that do not affect any party's substantial rights." Fed. R. Civ. P. 61. But "[e]rror cannot be regarded as harmless merely because the trial judge or the appellate court thinks that the result that has been reached is correct." FEDERAL PRACTICE & PROCEDURE § 2883. Instead, the "probable effect of the error" must be "determined in light of all evidence." Id. The "substantial rights" language of the Federal Rules has therefore been interpreted to require an examination into the likely outcome of the proceedings. An error is not harmless if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. 750, 765 (1946); see also United States v. David, 131 F.3d 55, 61 (2d Cir. 1997) (describing Kotteakos as "construing the 'substantial rights' language of 28 U.S.C. § 391 (from which Rule 61 is derived), as requiring an assessment of 'whether the error itself had substantial influence' on the outcome of the case.").

The court here erred by not instructing the jury on the preclusive effect of the section 75 hearing officer's factual findings. The court may also have erred by not instructing the jury on the persuasive weight of the report and recommendation and by excluding that report from evidence. These errors allowed Matusick to attempt to persuade the jury that he was falsely accused of misconduct in support of his argument that the ECWA's proffered legitimate reason for firing him was false. We conclude, however, that the error did not have the probable effect of having "substantial influence," David, 131 F.3d at 61, on the outcome of the trial.

We think it highly unlikely that the jury would have found the defendants' evidence regarding Matusick's alleged misconduct unconvincing. Matusick did testify about the incidents that served as the impetus for the section 75 hearing, including the water-line breaks on October 1 and October 20, 2005. However, he was thoroughly and effectively cross-examined on these points, and ECWA witnesses testified about their perception of his misconduct, including that he was sleeping on the job. Matusick himself had admitted to blocking the camera ten to twenty times when accepting his suspension without pay, a point the defense counsel stressed repeatedly to the jury. And Matusick's counsel argued in his summation that other ECWA employees were not terminated for

39

similar misconduct -- in effect conceding that Matusick had engaged in misconduct.

Importantly, the defendants also submitted evidence regarding the likely merit of Matusick's assertions, all of them consistent with the timing and content of the hearing officer's conclusions. They included business memoranda from differing incidents recording Matusick's misconduct in great detail, including call logs clearly demonstrating his failure to respond to calls for assistance, and his receipt of a 60-day suspension for his misconduct. With regard to the October 1, 2005, incident, for example, where Matusick had been charged with not responding to a large water leak for over an hour, and the October 20, 2005, incident, where Matusick failed to respond to a water leak for over three hours, the jury had before it work orders, letters from employees who witnessed the events and the citizens who had made the calls, log book entries, a newspaper article, interoffice memoranda, insurance letters, and deposition testimony that all confirmed that Matusick had failed to respond for the periods alleged on those dates. All of this specific and concrete evidence weighed against Matusick's general denial of the facts. And the jury had before it the notice of Section 75 charges, detailing the precise times of the calls and therefore the amount of time it took Matusick to respond, and it heard Mendez's testimony

that the section 75 report was "the strongest . . . report and recommendation that I've ever had towards a termination of an employee." Trial Tr. Aug. 26, at 162.

Finally, in light of the fact that the jury found Mendez, who ultimately adopted the hearing officer's recommendation, not to be individually liable for the wrongful termination claim, it seems unlikely that the jury credited Matusick's testimony that he had not committed misconduct justifying termination, and it is similarly unlikely that a different jury charge would have made a difference with respect to the jury's other findings. The evidence made clear what the section 75 hearing officer found: that Matusick had indeed committed the misconduct alleged.

The question on which the jury's determination likely hinged was whether, notwithstanding Matusick's misbehavior, which was well-documented, his treatment at the hands of the ECWA and its personnel was motivated, at least in substantial part, by his relationship with Starks. That was a question upon which the hearing officer's findings had no bearing.

In light of the substantial evidence that Matusick committed the misconduct found in the section 75 hearing report, we conclude that probable effect the error was harmless and decline to require the case to be retried.

II. Sufficiency of the Evidence on
Matusick's Unlawful Termination Claim

## A.     Evidence Linking the ECWA, Kuryak, and Lisinski to the Termination

The defendants also appeal from the district court's denial of their Rule 50 motions for judgment as a matter of law.  They argue that the jury's findings of liability on the unlawful termination claim under New York Executive Law § 296[14] cannot stand against the ECWA or either of the individual defendants held liable after trial –- Kuryak and Lisinski.

The defendants bear a heavy burden to prevail on this argument. "[A] Rule 50 motion must be denied unless the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." Cross v. N.Y.C. Transit Auth., 417 F.3d 241, 248 (2d Cir. 2005) (internal quotation marks omitted).  "[W]e review the district court's denial of a Rule 50 motion de novo, [and] we are bound by the same stern standards" on appeal.  Id.

---

[14] It is the law in our Circuit that "an employer may violate Title VII if it takes action against an employee because of the employee's association with a person of another race."  Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008). The same goes for New York Executive Law § 296, claims that, we have explained, are "analytically identical to claims brought under Title VII."  Torres v. Pisano, 116 F.3d 625, 629 n.1 (2d Cir. 1997).

42

With regard to the ECWA, the defendants first argue that because the jury found Mendez not liable for unlawful termination it could not have found the ECWA liable as Matusick's employer. In making this argument, the defendants point to a principle of New York law that an employer is not liable for the discriminatory acts of its employees unless it "approved of, or acquiesced in" these acts. Totem Taxi, Inc. v. N.Y.S. Human Rights Appeal Bd., 65 N.Y.2d 300, 304, 480 N.E.2d 1075, 1075, 491 N.Y.S.2d 293, 293 (1985). Kuryak's and Lisinksi's conduct was too remote from the employer's control to be the basis for the ECWA's liability, they argue, and because Mendez was held not individually liable, the ECWA cannot be held liable based on his conduct either.

Even if the jury's finding that Mendez was not liable for unlawful discrimination was inconsistent with a finding of liability against the ECWA, this would not necessarily require vacatur. We have long held the view that "[c]onsistent jury verdicts are not, in themselves, necessary attributes of a valid judgment." Globus v. Law Research Serv., Inc., 418 F.2d 1276, 1290 n.17 (2d Cir. 1969), cert. denied, 397 U.S. 913 (1970). The question, then, is whether there was sufficient evidence in the record to support a finding of liability on the part of the ECWA.

It is true that there is no direct evidence that higher-ups at the ECWA actively participated in the harassment of Matusick and terminated him as a result of his interracial relationship. But the law recognizes that "smoking gun" evidence of discrimination is rarely available; plaintiffs alleging discrimination are therefore "entitled to rely on circumstantial evidence." Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008). We need not reiterate the disconcerting history of the treatment of Matusick because of his relationship with Starks to conclude that the record contains substantial evidence to that effect: Matusick presented evidence of racially motivated harassment and intimidation at the ECWA that was chronic and pervasive. The jury could have concluded that racial animus tainted the investigation into Matusick's misconduct and that the ECWA was aware of that fact, or at least that such animus was a substantial factor in the ECWA's decision to follow the section 75 hearing officer's recommendation of termination. The ECWA has thus not carried its heavy burden under Rule 50.

There also appears to be some basis for the jury's determination that the ECWA, but not Mendez, was liable for unlawful termination. Under section 296, a person can be found individually liable for violations of the State's Human Rights law if either (1) he or she can be said to constitute the employer in his or

44

her own individual capacity, see Patrowich v. Chem. Bank, 63 N.Y.2d 541, 543, 473 N.E.2d 11, 13, 483 N.Y.S.2d 659, 661 (1984); see also N.Y. Exec. Law § 296(1)(a); or (2) if he or she "aid[s], abet[s], incite[s], compel[s] or coerce[s] the discriminatory conduct," N.Y. Exec. Law § 296(6).

As a general rule, individuals may be subject to liability as employers "if they have ownership interests in the [employer] or do more than carry out personnel decisions of others." Townsend v. Benjamin Enterprises, Inc, 679 F.3d 41, 57 2d Cir. 2012). Although there was substantial evidence that Mendez was himself responsible for making the decision to terminate Matusick, it does not necessarily follow that he is subject to personal liability for the acts of which Matusick complains under the circumstances of this case. By state law, Matusick was entitled to a section 75 hearing after which an independent hearing officer would evaluate whether he should be subject to discipline. The jury could plausibly have determined that Mendez's individual role in accepting the hearing officer's recommendations was too passive to warrant individual liability.

The defendants' argument that there was insufficient evidence to establish that other individual defendants -- Kuryak, who investigated the disciplinary charges, and Lisinksi, the Coordinator of Employee Relations --

45

aided and abetted the improper dismissal also fails. There was evidence in the record that both defendants knew about the harassment, did nothing to respond to it, and then participated directly in the investigation and termination. More: The jury had before it evidence that Lisinski, the employee relations specialist, had himself taunted Matusick based on Starks's race. It was for the jury to evaluate the credibility of these defendants' testimony and weigh it, along with the other evidence before it, to determine whether racial animus in part motivated the decision to terminate. See Kirsch v. Fleet St., Ltd., 148 F.3d 149, 164 (2d Cir. 1998). The jury's conclusion as to the responsibility of Kuryak and Lisinksi as aiders and abettors of the ECWA must stand.

## B.    Comparators

The defendants further assert that Matusick failed to establish that he was discriminated against because of his protected status inasmuch as he could not point to a similarly situated comparator. This argument, too, must be rejected if the verdict is one that "reasonable [persons] could have reached." Cross, 417 F.3d at 248. Matusick's evidence of comparators, although not overwhelming, is sufficient for a reasonable jury to have ruled in his favor on this claim.

The defendants argue to the contrary that the comparators Matusick has identified, "other [ECWA] dispatchers, who reported to the same supervisors under the same standards and engag[ed] in the same conduct," but were not terminated,  Appellees' Br. at 37, do not provide a sufficient basis for establishing discriminatory treatment because they are not similar to Matusick in "all material respects."  Ruiz, 609 F.3d at 494 (internal quotation marks omitted).  Unlike any alleged comparators, Matusick admitted to wrongful conduct (blocking the security camera), and thus agreed to a 60-day suspension before his section 75 hearing.  He was thus the only person terminated during the period at issue who had engaged in serious misconduct only months earlier.  Moreover, the defendants contend, the closest comparator, Radich, was also terminated for sleeping on the job, and he was not dating a black woman, suggesting that the basis for Matusick's discipline was his misconduct and not his romantic relationship.

The plaintiff argues, however, that he pointed to several comparators who were not terminated despite engaging in similar conduct.  It is true that none of these employees had as extensive a history of behavior potentially subject to legitimate discipline as did Matusick, but it does not follow

47

that they cannot serve as comparators. In <u>Graham v. Long Island R.R.</u>, 230 F.3d 34 (2d Cir. 2000), we reversed a district court's grant of summary judgment to an employer who terminated the plaintiff allegedly on the basis of his race. <u>Id.</u> at 36. Although we reiterated the rule that a comparator must be similarly situated in all material respects, <u>id.</u> at 39, we made it clear that this rule does not require a precise identicality between comparators and the plaintiff. "Whether two employees are similarly situated ordinarily presents a question of fact for the jury." <u>Id.</u> And the case law requires that for such evidence to be probative, and therefore to support a jury verdict, there must only be "an objectively identifiable basis for comparability." <u>Id.</u> at 40 (internal quotation marks omitted). We then concluded that the fact that one comparator (who had been treated differently from the plaintiff) had committed fewer infractions than had the plaintiff did not in itself mean that he could not be a comparator. <u>Id.</u> at 42-43.

The same reasoning applies here. There may not have been anyone at the ECWA who engaged in exactly the same misconduct as did Matusick, but this did not preclude the jury from considering the way that other employees who also engaged in disciplinable on-the-job misconduct were treated, combined with other indications that ECWA employees held racially discriminatory views,

to conclude that Matusick was terminated, at least in material part, because of the race of his romantic partner.

We therefore affirm the district court's denial of the defendants' Rule 50 motions with regard to the plaintiff's unlawful termination claims against the ECWA.

III.    Section 1983 Claims against ECWA
        and the Individual Defendants

The defendants mount various challenges to the jury's finding of liability on Matusick's section 1983 claims. We conclude that because his constitutional right to intimate association in the context of the First Amendment was not clearly established at the time of the alleged misconduct, the individual defendants held liable for these claims were entitled to qualified immunity. We therefore vacate the judgment against the individual defendants based on the section 1983 claims, including the award of punitive damages against them.

The ECWA, as a municipal entity, however, is not protected by qualified immunity. See Owen v. City of Independence, Mo., 445 U.S. 622, 650 (1980). And we conclude that, in light of the severity, pervasiveness, and notoriety of the conduct of the individual defendants, as established at trial, the jury's finding of liability against the ECWA is supported by the evidence.

49

**A.     Qualified Immunity**

1.  Background Principles.  Section 1983 provides persons with a private cause of action against those acting "under color of state law" to recover money damages for the deprivation of "any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  "But to ensure that fear of liability will not unduly inhibit officials in the discharge of their duties, the officials may claim qualified immunity[.]"  Camreta v. Greene, 131 S. Ct. 2020, 2030 (2011) (internal quotation marks omitted).  "Qualified immunity balances two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  Pearson v. Callahan, 555 U.S. 223, 231 (2009).

Toward this end, in evaluating a qualified immunity defense, courts must examine two factors: (1) whether the plaintiff has made out a violation of a constitutional right; and (2) whether that right was "clearly established" at the time of the defendant's alleged misconduct.  Id. at 232.[15]

_____

[15] This Court has at times placed a further gloss on these principles, stating that "[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the

Were we concerned solely with the individual defendants, our conclusion that they are protected by qualified immunity because Matusick's right to be free from interference with his intimate association with Starks was not clearly established at the time they acted, would require us to make the often difficult choice as to which component of the qualified immunity inquiry to address first. See Pearson, 555 U.S. at 236 ("permitt[ing us] to exercise [our] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand"). In this case, however, inasmuch as the ECWA would not be entitled to qualified immunity for any constitutional violation under Monell, 436

---

challenged action to believe his acts were lawful." Taravella v. Town of Wolcott, 599 F.3d 129, 134 (2d Cir. 2010) (some internal quotation marks omitted); accord Southerland v. City of N.Y., 680 F.3d 127, 141-42 (2012), cert. denied, 133 S. Ct. 980 (2013). This interpretation is not without controversy, see, e.g., Walczyk v. Rio, 496 F.3d 139, 165-66 (2d Cir. 2007) (Sotomayor, J., concurring) (describing the gloss as a "doctrinal misstatement[]" and stating that "whether a right is clearly established is the same question as whether a reasonable officer would have known that the conduct in question was unlawful" (emphasis in original)).

We need, not, however, address the question of whether it would have been objectively reasonable for the individual defendants here to believe that their conduct was lawful even if the constitutional right asserted by Matusick were clearly established -- the defendants have never argued this basis for qualified immunity. And in any event, we conclude that the right at issue was not clearly established for the purposes of this defense.

U.S. at 690-91, see Owen, 445 U.S. at 650, we must in any event decide the nature and extent of the plaintiff's constitutional right of intimate association to determine the ECWA's liability. We therefore begin by considering the merits of Matusick's constitutional claims.

2. Merits. The district court instructed the jury that in order for it to conclude that any of the individual defendants were liable to the plaintiff under section 1983, the jury was required to find that "those acts that [the jury] ha[s] found that the defendant took under color of state law caused the plaintiff to suffer the loss of a federal right." Trial Tr. Aug. 31, at 111. The right at issue in this case, according to the district court, was "the plaintiff's right to enter into intimate relations with another person." Id. The court instructed the jury that Matusick's relationship with "his then-girlfriend Anita Starks" was a constitutionally protected intimate relationship, id. at 112; and further, that "[t]he loss of the right to associate does not have to mean literally that the relationship ended or it was impaired. This right can be violated if someone is penalized for those -- for who the other person is in a relationship." Id. at 112.

The questions we must address at this stage of our qualified immunity analysis are (1) whether the relationship between Matusick and Starks

52

was protected by the constitutional right to intimate association; and (2) whether the conduct alleged by Matusick and later found by the jury to "penalize[]" Matusick for this relationship was a sufficient infringement of the right to this intimate association that Matusick's constitutional right was violated.[16]

These questions are not easily disentangled. As we have observed, a "categorical approach is inappropriate for dealing with association-rights cases. It fails to account for the 'broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State.'" Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y., 502 F.3d 136, 144 (2d Cir. 2007) (quoting Roberts v. U.S. Jaycees, 468 U.S. 609, 620 (1984)). Instead, "the question is: Upon a balancing of all pertinent factors, do the state's interests, and its means of achieving them, justify the state's intrusion on the particular associational freedom?" Id.

---

[16] Although we highlight the district court's jury instructions as an articulation of the district court's understanding of the law governing Matusick's claims, the court's denial of qualified immunity, insofar as it does not involve the resolution of a dispute of fact, is "a question of law better left for the court to decide." Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003) (internal quotation marks omitted). We therefore review the district court's denial of qualified immunity de novo. See Arlio v. Lively, 474 F.3d 46, 51 (2d Cir. 2007) ("We review a denial of qualified immunity de novo."); Anderson v. Recore, 446 F.3d 324, 328 (2d Cir. 2006) (same).

53

We separate the questions here in order to clarify the level of constitutional protection afforded relationships like Matusick's. We conclude that, whatever the treatment we would be required to give other intimate romantic relationships, Matusick's betrothal to Starks under the circumstances presented here constituted an intimate association, part and parcel of their eventual marriage and entitled to similar protection under the First Amendment. Considering Matusick's interests in preserving and protecting his intimate espousal relationship with Starks, we conclude that the conduct that he alleges that the ECWA and the individual defendants committed violated his constitutional right to intimate association.

### a. Right to Intimate Association

The right to intimate association was first recognized by the Supreme Court in Roberts v. United States Jaycees, 468 U.S. 609 (1984), a case brought by a civic organization challenging a Minnesota statute prohibiting the group from excluding women. Id. at 615-17. The Court addressed the claim under the "constitutionally protected 'freedom of association,'" which exists in "two distinct senses," id. at 617: first, the choice to "enter into and maintain certain intimate human relationships [without] undue intrusion by the State,"

54

and, second, the right to associate with others "for the purpose of engaging in those activities protected by the First Amendment -- speech, assembly, petition for the redress of grievances, and the exercise of religion," id. at 617-18. It is the first of these rights -- the right to intimate association, as opposed to expressive association -- that is the subject of the section 1983 claims here.[17]

In Roberts, the Court began by explaining that the right to intimate association is undergirded by at least two constitutional interests, each related to

_____

[17] Although it is clear that the Constitution protects a right to form intimate associations with other individuals or small groups, the origin of this right is the subject of considerable controversy. See Adler, 185 F.3d at 42 ("The source of the intimate association right has not been authoritatively determined."). Some case law suggests that the right is included within the personal liberty protected by the Due Process Clause. See id. (citing cases); IDK, Inc. v. Cnty. of Clark, 836 F.2d 1185, 1192 (9th Cir. 1988) ("[T]he Supreme Court has most often identified the source of the protection as the due process clause of the fourteenth amendment, not the first amendment's freedom to assemble."). Other cases place it under the ambit of the First Amendment. See, e.g., Starling v. Bd. of Cnty. Comm'rs, 602 F.3d 1257, 1260 (11th Cir. 2010) (describing the "First Amendment right to intimate association"). Or it may best be understood as falling within the "borderlands of the First Amendment" but undergirded by other constitutional doctrines, including equal protection and substantive due process. See Kenneth L. Karst, The Freedom of Intimate Association, 89 YALE L.J. 624, 655 (1980).

Ultimately, though, the precise constitutional origins of this right are not, in themselves, critical to our analysis, except to the extent that understanding the constitutional values at stake in these cases –- liberty, privacy, expression, and equality –- helps guide our analysis of how far this right extends.

the protection of individual liberty against state intrusion. First, there is a social interest in preserving such protection: "[C]ertain kinds of personal bonds have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs," a process essential to the maintenance of a pluralistic democracy, as these values "foster diversity and act as critical buffers between the individual and the power of the State." Id. at 619. Second, the right to intimate association protects individual interests central to the freedom of expression by "safeguard[ing] the ability independently to define one's identity that is central to any concept of liberty." Id. at 618-19.

The Court then offered this guidance as to the types of relationships thought to implicate these constitutional interests:

> The personal affiliations that exemplify these considerations, and that therefore suggest some relevant limitations on the relationships that might be entitled to this sort of constitutional protection, are those that attend the creation and sustenance of a family -- marriage, childbirth, the raising and education of children, and cohabitation with one's relatives.

Id. (citations omitted).

Finally, the Court recognized that the diversity of human relationships necessitated a sliding-scale analysis rather than a bright-line test: "We need not mark the potentially significant points on this terrain with any

56

precision.  We note only that factors that may be relevant include size, purpose, policies, selectivity, congeniality, and other characteristics [of an associative relationship] that in a particular case may be pertinent."  Id. at 620.

The Roberts Court's reference to traditional familial relationships, most notably marriage, has led some courts to conclude that the right does not extend to romantic relationships beyond marriage.  See, e.g., Poirier v. Mass. Dep't of Corr., 558 F.3d 92, 96 (1st Cir. 2009) ("The unmarried cohabitation of adults does not fall under any of the Supreme Court's bright-line categories for fundamental rights in this area." (citing Roberts, 468 U.S. at 619)); see also Cameron v. Seitz, 38 F.3d 264, 274-76 (6th Cir. 1994).

We think this to be an unduly narrow reading of Roberts.  The Court did not suggest that constitutional protections applied only to the relationships it enumerated.  Rather than setting forth an exclusive and definitive list, the Court instead spoke to relationships that "involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experience, and beliefs but also distinctively personal aspects of one's life."  468 U.S. at 619-20.  The Court's specific reference to marital relationships therefore should not, we think, be viewed as a formalistic

recognition of a particular, narrow legal status entitled to protection. Rather, at least to the extent that a relationship of betrothal constitutes an expression of one's choice of marital partner, it shares the qualities ascribed by the Roberts court to marriage and other protected forms of intimate association. We therefore conclude that Matusick's betrothal to Starks fulfilled the standards set out in Roberts and is entitled to protections similar to those that marital relationships enjoy under the right to intimate association.[18]

There is no question here but that the relationship between Starks and Matusick was a bona fide betrothal: They were involved in a long-term romantic relationship, held themselves out as engaged and were recognized as such, maintained together a relationship with Starks' children, and shared

---

[18] Although the Roberts Court indeed took pains not to "mark the potentially significant points on th[e] terrain [of the right] with any precision," 468 U.S. at 620, the Supreme Court addressed the question more directly in Rotary Club v. Duarte, 481 U.S. 537 (1987), observing that it had never held that "constitutional protection is restricted to relationships among family members." Id. at 545.

Of course, not all romantic relationships presuppose such deep attachments. The Supreme Court has made the relevant, if rather uncontroversial, point that "'personal bonds' that are formed from the use of a motel room for fewer than 10 hours are not those that have 'played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideals and beliefs.'" FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 237 (1990) (quoting Roberts, 468 U.S. at 618-19).

significant features of their private life together in anticipation of marriage. It may be worth noting that they did indeed marry. But that fact cannot, of course, be part of the test and we do not rely on it for that purpose because, had their relationship been otherwise identical but failed for some reason to ripen into marriage, it would nonetheless have been the same relationship we conclude was deserving of constitutional protection at the time of the defendants' interference with it. Their relationship at the time of the events at issue here was thus an integral part of their eventual choice to enter into the formal, legal bonds of marriage -- it was marked by the same characteristics of deep attachment, commitment, and self-identification that <u>Roberts</u> and its progeny have viewed as characteristic of constitutionally protected intimate association. We reach this conclusion not, as the dissent suggests, by drawing "descriptive analogies," but by applying the standard set out by the Supreme Court in <u>Roberts</u> to the facts of this case as best we can, and deciding that the right of intimate association it describes extends to the particular relationship at hand.

      **b.**     **Whether the Defendants' Conduct Here Violated Matusick's Right to Intimate Association**

Having concluded that Matusick possessed a constitutional right protecting his intimate association with Starks, the next question is whether that right was violated.

First, we note that this is an association which most ECWA witnesses testified to being aware of. Even had they not, the evidence is clear that the ECWA defendants knew of the nature of Matusick and Starks' relationship: Starks drove Matusick to work, and Matusick introduced her as his girlfriend at work-related gatherings. But more striking: We cannot interpret the language of ECWA defendants when they called Matusick a "nigger lover" or told him that his "bitch is [a] [nigger]" as demonstrating anything other than a knowledge of and disdain for the nature of Matusick and Starks' relationship.

The question then is whether this right was violated. The Roberts Court provided little guidance as to how to determine whether the right of intimate association has been infringed upon beyond noting that courts must engage in a "careful assessment of where that relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." Id. at 620.

Some courts have examined whether the relationship at issue calls for strict or intermediate scrutiny or rational basis review.  See, e.g., Poirier, 558 F.3d at 96.  In the public employer context, others have applied the balancing test set out by the Supreme Court in Pickering v. Board of Education, 391 U.S. 563, 566-68 (1968), in order to weigh the relative interests of the plaintiff in preserving an intimate relationship and the interests of the state in "promoting the efficiency of the public services it performs through its employees."  Id. at 568; see, e.g., Shahar v. Bowers, 114 F.3d 1097, 1103 (11th Cir. 1997) (en banc), cert. denied, 522 U.S. 1049 (1998).

We do not think it necessary to choose among those standards to resolve the issues in this case.  The ECWA had no legitimate interest in interfering with Matusick's espousal relationship with Starks or terminating him on account of this relationship -- in other words, there is nothing to be placed in the balance against Matusick's exercise of his right of intimate association.  To interfere with Matusick's constitutional right "on so unsupportable a basis as rac[e is] so directly subversive of" the constitutional interests at stake, Zablocki v. Redhail, 434 U.S. 374, 398 (1978) (Powell, J., concurring in the judgment), that it cannot, under any circumstance we can conceive of, be accepted.  Cf. Loving v.

<u>Virgina</u>, 388 U.S. 1, 11 (1967) (striking down state law prohibiting inter-racial marriage under the Equal Protection Clause of the Fourteenth Amendment, remarking that "[t]here is patently no legitimate overriding purpose independent of invidious racial discrimination which justifies this classification.").

c.     **Matusick's Failure to Bring a**
**Racial Discrimination Claim**

Finally, we note a somewhat perplexing aspect of the manner in which Matusick pursued his claims.  He might well have attempted to bring and state them in terms of racial discrimination rather than the right to intimate association; indeed, if the case had been so brought and charged to the jury, our disposition of the constitutionality of the matter would not likely have required us to interpret the reach of the <u>Roberts</u> opinion, and probably would have removed the individual defendants' qualified immunity shield.  The right to be free from race discrimination on the basis of one's racial affiliation –- intimate or otherwise -- is, and has long been, clearly established.  <u>See, e.g.</u>, <u>Bob Jones Univ. v. United States</u>, 461 U.S. 574, 605 (1983) (detailing how decisions of the Supreme Court "firmly establish that discrimination on the basis of racial affiliation and association is a form of racial discrimination" prohibited by the Fourteenth Amendment).  Matusick, however, chose not to tread this path.  That choice,

62

made for whatever reason, is not relevant to our analysis of Matusick's

constitutional right to intimate association, upon which he did base his claims.

3. Clearly Established. We must decide at this juncture, see Pearson,

555 U.S. at 231, whether it was clearly established at the time the defendants took

the actions that are the subject of this suit that a betrothal relationship of the kind

Matusick shared with Starks was protected by the First Amendment right to

intimate association. We conclude that it was not, and that, therefore, the

individual defendants are immune from liability here.

In order for a constitutional right to be clearly established, "[t]he

contours of the right must be sufficiently clear that a reasonable official would

understand that what he is doing violates that right." Anderson v. Creighton, 483

U.S. 635, 640 (1987). This does not mean that there must be a factual equivalency

between the case at issue and prior cases. The "salient question" instead is

whether the case law at the time in question would have put reasonable officers

on "fair warning" that their conduct violated the plaintiff's rights. Hope v. Pelzer,

536 U.S. 730, 741 (2002).

In performing this analysis we consider, "(1) whether the right in

question was defined with 'reasonable specificity'; (2) whether the decisional law

63

of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." Ying Jing Gan v. City of N.Y., 996 F.2d 522, 532 (2d Cir. 1993) (internal quotation marks omitted).

Here, in determining that the plaintiff's right to intimate association with a person to whom he was engaged to be married was clearly established, the magistrate judge's report and recommendation, later adopted by the district court, cited a 2007 decision of the United States District Court for the District of North Dakota, Steinbach v. Branson, No. 05-cv-101, 2007 WL 2985571, 2007 U.S. Dist. LEXIS 75156 (D.N.D. Oct. 9, 2007), and a non-precedential 2004 summary order of the Ninth Circuit, which stated simply that "the First Amendment right of association extends to individuals involved in an intimate relationship, such as fiancés," Wittman v. Saenz, 108 F. App'x 548, 550 (9th Cir. 2004).

That authority is insufficient to render that rule "clearly established" for present purposes. To be sure, there is authority to the effect that a constitutional right may be sufficiently well established even if there is no Supreme Court ruling or ruling on the relevant circuit's part on point. See, e.g.,

Varrone v. Bilotti, 123 F.3d 75, 78-79 (2d Cir. 1997) But the law must nonetheless be well enough settled -- capable of making a reasonable person aware of whether an act violates a constitutional right -- so that in fairness and pursuant to the purpose of qualified immunity to protect public officials acting in good faith, the defendant can be held to account for a violation. We have thus held, at the other end of the spectrum from the present case, that where the law was established in three other circuits and the decisions of our own Court foreshadowed the right, for example, that the law was sufficiently "well established" that its violation stripped the defendant of his immunity. Id. None of our cases suggest, however, that an out-of-circuit district court precedent and a fleeting and non-precedential reference from another circuit court is enough to render a right clearly established. Indeed, we have specifically cautioned against the reliance on non-precedential summary orders in "clearly established" analyses. See Jackler v. Byrne, 658 F.3d 225, 244 (2d Cir. 2011), cert. denied, 132 S. Ct. 1634 (2012). "Non-precedential" decisions, by their very definition, do not make law.

This result is supported here by our frequent observations about the ambiguity of the right to intimate association. As already noted, we have said

that the nature and the extent of the right are "hardly clear," <u>Adler</u>, 185 F.3d at 42, and, as we have noted, "[t]he source of the intimate association right has not been authoritatively determined." <u>Id</u>. This, combined with the Supreme Court's specific reference to marriage as the kind of relationship afforded this sort of constitutional protection in <u>Roberts</u>, suggests that there were not court decisions that sufficiently foreshadowed to a reasonable officer in 2004-2005 that the right to intimate association would extend to the relationship between Matusick and Starks, as we conclude it does here. While not determinative, having spent as much time and effort in deciding whether or not the defendants behavior violated Matusick's First Amendment right to intimate association under <u>Roberts</u>, we would be hard put to hold the defendants to the knowledge of what our answer would be.

We conclude that the individual defendants held liable on the section 1983 claims are immune from these claims, and the $5,000 award in punitive damages against each of them is vacated.[19]

---

[19] We are mindful that the right at issue was clearly established under state law and likely also under federal statutory law. <u>See</u> <u>supra</u> note 14. This does not, however, result in the defendants being subject to damages for the plaintiff's constitutional claims. The Supreme Court has observed that, though officials should "conform their conduct to applicable statutes and regulations," qualified immunity is cabined to constitutional violations. <u>Davis v. Scherer</u>, 468 U.S. 183,

**B.** **Monell Liability**

The conclusion that the individual defendants are immune with respect to this claim does not dispose of all of the section 1983 claims made in this case. The defendants assert that the finding of liability on the section 1983 claim against the ECWA was not supported by the evidence. The ECWA, as a municipal entity, does not enjoy absolute or qualified immunity from section 1983 suits. Owen, 445 U.S. at 650. And we therefore must review the jury's finding to determine whether it should be set aside because it is not supported by sufficient evidence such that a reasonable jury could return the verdict here.

This task is complicated by the principle that a municipality cannot be held liable for the conduct of employees under a respondeat superior theory, i.e., simply by dint of the employer-employee relationship between the ECWA and the employee defendants found liable by the jury. See Monell, 436 U.S. at

194-95 (1984) (acknowledging "that officials should conform their conduct to applicable statutes and regulations," but declining to hold "that the violation of such provisions is a circumstance relevant to the official's claim of qualified immunity."); see also Williams v. Dep't of Veteran Affairs, 879 F. Supp. 578, 584 (E.D. Va. 1995) ("When examining a qualified immunity defense to an action brought under the Constitution, the question is not whether reasonable government actors would know that the alleged behavior was wrong, unethical, or illegal under state or federal statutes and rules, but whether they would believe it to be unconstitutional." (emphasis in original)), rev'd on other grounds, 104 F.3d 670 (4th Cir. 1997), cert. denied, 526 U.S. 1150 (1999) .

691.  A municipality is liable under section 1983 only if the deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or usage of the municipality.  Id.; see also Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011).

We recently concluded that, while "isolated acts . . . by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify liability," they can be the basis of liability if "they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage" of which supervisors must have been aware.  Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012).  The question is therefore whether there is evidence that "a policymaking official ordered or ratified the employee's actions -- either expressly or tacitly."  Id.

A custom or policy of harassment and other discriminatory acts giving rise to hostile work environment claims can form the basis of section 1983 claims.  See, e.g., Patterson v. Cnty. of Oneida, 375 F.3d 206, 226 (2d Cir. 2004) (discussing section 1983 liability for harassment and other forms of discriminatory acts, "including those giving rise to a hostile work environment");

Gierlinger v. N. Y. State Police, 15 F.3d 32, 34 (2d Cir. 1994) ("Section 1983 liability can be imposed upon individual employers, or responsible supervisors, for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer.").

Like the district court, we conclude that there were sufficient facts in the record such that a reasonable fact-finder could conclude, as the jury in fact did, that the verbal and physical harassment of Matusick on the basis of his intimate association with Starks rose to the level of a custom, policy, or practice at the ECWA.

First, the acts of discrimination and harassment alleged by Matusick were frequent and severe. Although Matusick hesitated before alerting his supervisors, ultimately many human resources personnel, including the director of human resources, were aware of his complaints well before he was terminated. They failed to act.

According to testimony that the jury was entitled to accept, Lisinski, ECWA Coordinator of Employee Relations, raised Matusick's complaints directly with Matusick during an interview concerning Matusick's covering the

surveillance cameras in the dispatch office. Matusick also discussed the harassment prior to that occasion with other superiors. There was evidence that Karla Lewis, the ECWA's director of human resources, who reported to Mendez, knew of but chose not to investigate the harassment. The jury could reasonably have found that the ECWA's inaction in the face of known and pervasive harassment reflected an unconstitutionally discriminatory custom or practice. See Jones, 691 F.3d at 81; Patterson, 375 F.3d at 226 (municipal liability may be established by showing of conduct "so manifest as to imply the constructive acquiescence of senior policy-making officials").

And a reasonable jury properly could have found a sufficient basis for Monell liability in Mendez's lack of response to the pervasive harassment. First, the jury could have believed Matusick and Starks that Mendez knew of their intimate association because he had met them together. Second, based on the pervasiveness of the harassment and the lack of response, the jury could reasonably have found that Mendez's inaction and acquiescence to the harassment that Matusick suffered allowed the harassment to become the custom and practice, if not the policy, of the ECWA. See Turpin v. Mailet, 619 F.2d 196, 200 (2d Cir.), cert. denied, 449 U.S. 1016 (1980) ("Indeed, by holding that a

70

municipality can be held liable for its 'custom' <u>Monell</u> recognized that less than formal municipal conduct can in some instances give rise to municipal liability under section 1983. To require that senior officials must have formally adopted or promulgated a policy before their conduct may be treated as 'official' would for present purposes render <u>Monell</u> a nullity, exalting form over substance."). Indeed, Karla Lewis's high-level position -- she reported directly to Mendez -- and her failure to address the harassment supports an inference that Mendez also knew of the harassment and allowed for the conduct to become the accepted custom or practice of the ECWA. In addition, the continuation of the harassment in several forms over time certainly supports the reasonableness of the conclusion that Mendez's "fail[ure] properly to investigate and address allegations" of harassment allowed for "the conduct [to] become[] an accepted custom or practice of the employer." <u>Gierlinger</u>, 15 F.3d at 34.

We therefore affirm the jury's finding of liability with respect to Matusick's section 1983 claims against the ECWA.

## C. Damages Against the ECWA

Before concluding, we must address an issue not raised by either party. The district court instructed the jury that if it found one or more of the

defendants liable on Matusick's section 1983 claims, but found that he had "suffered no actual injury as a result of this violation, you may award the plaintiff nominal damages." Trial Tr., Aug. 31, at 125. Although the jury ultimately found the ECWA liable for violating Matusick's constitutional rights, it declined to award damages of any kind against it. The court's instruction was erroneous, and the jury's verdict necessitates a limited remand in this case.

It is well established that "an award of nominal damages is not discretionary where a substantive constitutional right has been violated." Gibeau v. Nellis, 18 F.3d 107, 110-11 (2d Cir. 1994); see Smith v. Coughlin, 748 F.2d 783, 789 (2d Cir. 1984) ("[E]ven when a litigant fails to prove actual compensable injury, he is entitled to an award of nominal damages upon proof of violation of a substantive constitutional right."). Accordingly, we have held that "it is plain error to instruct the jury merely that, having found a violation, it 'may' award nominal damages." Robinson v. Cattaraugus Cnty., 147 F.3d 153, 162 (2d Cir. 1998). The instructions should be clear that the jury "must" award nominal damages if it finds that the plaintiff has shown no actual injury from a proven constitutional violation. Id., at 162; LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 431 (2d Cir. 1995) (citing Gibeau, 18 F.3d at 110-11).

72

Where a trial court gives an erroneous instruction of this kind, "and the plaintiff has been awarded no actual damages, we will remand for the award of nominal damages." LeBlanc-Sternberg, 67 F.3d at 431. Because this is just such a case, we remand to the district court for the limited purpose of directing it to enter an award of nominal damages against the ECWA.

**D.    Award of Attorney's Fees**

The district court awarded attorney's fees on the basis of the prevailing-party statute, 42 U.S.C. § 1988(b).[20] After approving the applicable rates for Matusick's attorneys and staff, the court made an across-the-board 50 percent reduction based on a perceived lack of detail in the billing records. This reduction is the only issue raised in the plaintiff's cross-appeal.

Under prevailing-party statutes such as section 1988, there is a presumption that the lodestar figure represents a reasonable fee, and "if the court . . . reduces that figure it must state its reasons for doing so as specifically as possible." Id., at 764 (internal quotation marks and alterations omitted). "Applications for fee awards should generally be documented by

---

[20] In light of our decision to remand in part, we note that an award of attorney's fees under § 1988 is not foreclosed by the plaintiff's recovery of only nominal damages for a constitutional violation. See, e.g., Cabrera v. Jakabovitz, 24 F.3d 372, 393 (2d Cir. 1994).

contemporaneously created time records that specify for each attorney, the date, the hours expended, and the nature of the work done." Kirsch, 148 F.3d at 173. The district court stated its reasons for the reduction:  It decided not to award the lodestar amount because of concerns regarding "unspecified conferences, telephone calls, email correspondence, and reviews." Matusick, 774 F. Supp. 2d at 532.

"We afford a district court considerable discretion in determining what constitutes reasonable attorney's fees in a given case, mindful of the court's 'superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" Barfield v. N.Y.C. Health & Hosps. Corp., 537 F.3d 132, 151 (2d Cir. 2008) (quoting Hensley v. Eckerhart, 461 U.S. 424, 437 (1983)).  A fee award will not be disturbed absent an abuse of discretion.  See Crescent Publ'g Grp., Inc. v. Playboy Enters., Inc., 246 F.3d 142, 146 (2d Cir. 2001).

We find no abuse of discretion here.  The district court provided a reasoned and thorough explanation for its decision to reduce the proposed lodestar amount.  Indeed, the defendants raised questions about the plaintiff's attorney's billing records, and the district court provided the plaintiff with an

opportunity to supplement his fee request. Counsel nevertheless failed to submit additional documentation to justify the award. The district court's fee award is therefore affirmed.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court with respect to the state law claims and its award of backpay to the plaintiff. We also affirm the judgment as to the plaintiff's section 1983 claim against the ECWA. We reverse the judgment imposing liability against the individual defendants on the plaintiff's section 1983 claims against them, and therefore also reverse the judgment insofar as it awarded punitive damages against the individual defendants. On cross appeal, the district court's attorney's fee award is affirmed. Finally, we remand the cause to the district court, directing it to enter an award of nominal damages against the ECWA in the amount of one dollar, consistent with the jury's finding of liability on the plaintiff's constitutional claim.

Costs of the plaintiff on appeal to be paid by the ECWA.

REENA RAGGI, *Circuit Judge, concurring in part in the judgment and dissenting in part*:

On this appeal, we consider a judgment in favor of plaintiff Scott Matusick on state law claims of race discrimination and retaliation, as well as a federal claim of infringement of the right of intimate association, all arising out of Matusick's employment with the Erie County Water Authority ("ECWA"). On plaintiff's state law claims, the judgment (1) holds ECWA, as well as defendants Bluman, Kuryak, and Lisinski liable for a racially hostile work environment, but awards no compensatory damages; and (2) holds ECWA, Kuryak, and Lisinski liable for racially discriminatory termination, and awards $304,775.00 in back pay. On plaintiff's federal claim, the judgment (3) holds ECWA, Mendez, Bluman, Kuryak, and Lisinski liable, awards no actual or nominal compensatory damages, but awards $5,000 in punitive damages as against each individual defendant.[1]

I join my panel colleagues in affirming that part of the judgment holding defendants liable under state law for creating a racially hostile work environment. I also join in the panel decision to reverse that part of the judgment holding liable individual defendants Mendez, Bluman, Kuryak, and Lisinski on Matusick's federal

---

[1] Because no compensatory damages are awarded on the federal claim, it appears that the jury's intimate association finding pertained only to Matusick's complaint about a hostile work environment, not to his termination.

1

intimate association claim. I respectfully dissent, however, from the panel decision to affirm the judgment in all other respects.

With respect to Matusick's claims of racially discriminatory termination, I would vacate the judgment and remand for a new trial. Like the majority, I identify error in the district court's failure to preclude Matusick from disputing facts found against him at a disciplinary hearing conducted preliminary to his discharge pursuant to N.Y. Civ. Serv. Law § 75(1), and in the court's failure to charge the jury that it could not second-guess these administrative findings in its own deliberations. See ante at 36–37. Unlike the majority, however, I do not think these errors can be dismissed as harmless.

As to Matusick's intimate association claim against ECWA, I would order dismissal. While I think the circumstances at issue might have supported holding ECWA, as well as individual defendants, liable for race discrimination under the Equal Protection Clause—a federal claim plaintiff chose not to pursue—I do not think that, as the case was tried, they demonstrate an ECWA policy or custom of interference with intimate association, specifically, with engagement to marry.

2

1. <u>Racially Discriminatory Termination: The Preclusion Errors Were Not Harmless</u>

As the majority opinion explains, New York law gives preclusive effect to quasi-judicial administrative fact-finding where there has been a full and fair opportunity to litigate the point at issue. Thus, a federal court will do the same. <u>See ante</u> at 26–27 (citing relevant authority). Insofar as Matusick was charged with various acts of workplace misconduct preliminary to being terminated—specifically, sleeping on the job and failing timely to dispatch workers to the site of a water main leak on October 1, 2005; and failing timely to respond to a reported water-pressure problem on October 20, 2005—he plainly had a full and fair opportunity to litigate these accusations at a Section 75 proceeding before an independent hearing officer who found them proved. <u>See ante</u> at 12–15. Thus, the panel agrees that the district court erred both in allowing Matusick to argue to the contrary at trial and in failing to instruct the jury as to the preclusive effect of the Section 75 misconduct findings on its own deliberations. <u>See ante</u> at 37, 40. The panel majority nevertheless dismisses these errors as harmless, concluding that they did "not affect any party's substantial rights." Fed. R. Civ. P. 61; <u>see ante</u> at 39–41. I respectfully disagree.

3

While the law strongly disfavors retrial in civil cases, see Fed. R. Civ. P. 61, such relief is warranted where an appellant shows that complained-of error affected substantial rights, see Tesser v. Bd. of Educ., 370 F.3d 314, 319 (2d Cir. 2004). To carry this burden, an appellant must show that the error likely affected the outcome of the case. See Lore v. City of Syracuse, 670 F.3d 127, 150 (2d Cir. 2012) (holding that "substantial right is not implicated if there is no likelihood that the error or defect affected the outcome of the case"); ante at 40 (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).[2] That showing is made here by the record of Matusick's own arguments at trial insisting that he had not engaged in the charged misconduct, leaving racial bias as the likely explanation for his termination.

As to October 1, 2005, Matusick's counsel specifically told the jury that his client "wasn't sleeping" at work on that date and had in fact "dispatched the duty man in a timely manner." J.A. 2924. Both statements are in direct contradiction to

_____

[2] In Kotteakos, a criminal case, the Supreme Court observed that error is not harmless if "one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." Kotteakos v. United States, 328 U.S. at 765. To the extent this appears to resolve ambiguities in favor of a defendant, it is noteworthy that a criminal defendant's "substantial rights" include the presumption of innocence and the right not to be convicted except upon proof beyond a reasonable doubt, which are not applicable in civil cases.

4

the hearing officer's findings of fact. The district court did not admit these findings into evidence, much less did it instruct that such findings were binding on the jury's own deliberations. Thus, even though defendant Mendez, who made the final termination decision, was permitted to testify that the hearing officer's Section 75 discharge recommendation was the strongest he had ever seen, Matusick's counsel was allowed to impugn this recommendation and the undisclosed findings on which it was based as the "irrelevant" product of a "kangaroo court." J.A. 2932. Indeed, counsel was allowed to argue at length that the evidence would admit no conclusion other than that Matusick had not engaged in any workplace misconduct on October 1:

> The Water Authority concluded that the water was shut down within a reasonable period as reflected in their own claim file denying the claim by the resident. . . . The evidence is clear that the call came in at 5 a.m. Mr. Lisinski and Mr. Jaros admit that there w[ere] no calls prior to 5 a.m. . . .

> Mr. Kuryak and Mr. Jaros confirmed that there w[ere] no police or highway records of any calls. After that call came in Mr. Matusick found Mr. Marzec, he then had some problems with his computer, but he was printing the necessary documents by 5:31. Mr. Baudo admitted the computer issues were possible and Mr. Schichtel confirmed the computer problems were far more common during the midnight shift. The computer documents in evidence do not show that there weren't computer problems. In fact, some missing evidence, pages one through nine of Plaintiff's Exhibit 31. We have page 9, but we don't have pages

5

1 through 8. We don't know what happened prior to 5:47 a.m. That evidence is not available to you.

It is undisputed that Mr. Marzec had difficulties using the laptop, which made it more important that Scott Matusick print out maps for him before he left. But even despite all that, Mr. Marzec was on the scene by 6:30. Mr. Matusick was where he was supposed to be throughout, in his chair, by the phone at all times. Mr. Lisinski admitted that. There's no evidence he was sleeping on October 1st. [T]here's no video of him sleeping, and [Water Authority officials] knew . . . how to preserve videos if that evidence was going to be important to them.

J.A. 2924–25.

As to October 20, 2005 misconduct, Matusick's counsel similarly insisted that his client had not failed timely to respond to a report of a possible water leak. Rather, he "simply made a judgment call" to wait "for a second customer call" before dispatching the duty man. J.A. 2925. This too was in direct contradiction to what should have been binding findings of fact by the hearing officer. The officer specifically found that Matusick had not timely responded to a 1:50 a.m. report of a drop in water pressure indicative of a potentially serious water leak. Indeed, the hearing officer found that Matusick had misrepresented ECWA's policy when he told the caller who first reported a problem, "[W]e don't send a guy out there by himself in the middle of the night looking for a water leak." J.A. 312. The hearing

6

officer concluded that Matusick's failure either to dispatch a Water Authority employee to the site or to arrange for an over-the-phone assessment of the problem could not have reflected "a judgment call" in light of his discredited account of a purported second call.  J.A. 311.

Instead of accepting these findings, as the law required, Matusick's counsel argued to the jury that the soundness of Matusick's "judgment call" in not taking immediate action on October 20 was so plainly supported by the testimony of "nearly all the witnesses" as to be, in effect, indisputable:

> Again, the facts are clear.  At approximately 2:15 a.m. there was the first call regarding just low pressure, no visible water, no visible leak.  This is in a remote area where there are open fields and ditches and there aren't many houses and a caller who lived back from the road.
>
> At 5:10 a.m. a second call came in where a leak was observed and Mr. Matusick promptly dispatched the duty man.  A third call came in [at] 5:22 just 12 minutes later, reporting water in the field.  But by then Mr. Matusick was already dispatching the duty man.  You heard plenty of testimony about other potential causes of low pressure, not just a water main break, it included corroded pipes, blocked screens on intakes, malfunctioning pressure reducing valves, garden hoses being left on, et cetera, et cetera, et cetera.
>
> You heard testimony from dispatchers, active and retired, from engineers, that you don't just dispatch based on one low pressure call in the middle of the night in a remote area. . . .
>
> Plaintiff's Exhibit 53 reinforces the practice of waiting until morning to dispatch in connection with low pressure.  Only Mr. Jaros claimed that

7

you also dispatched the duty man regardless of circumstances. Every other witness disagreed. You consult control, you wait for a second call, you wait until someone sees water, sees an actual leak, then you dispatch the duty man.

J.A. 2926–27.

Plainly, Matusick's purpose in making these arguments was to show pretext. If he could convince the jury that there was nothing to the misconduct charges, then the defendants' proffered legitimate reason for terminating him was false, making it more likely than not that the real reason for his termination was race discrimination or retaliation. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 149 (2000) (noting probative value of proof that employer's explanation is false); James v. N.Y. Racing Ass'n, 233 F.3d 149, 155 (2d Cir. 2000) (explaining that "in some circumstances a prima facie case plus falsity of the employer's explanation can, without more, be enough to support a reasonable finding that prohibited discrimination has occurred"). If, instead, Matusick had been properly foreclosed from disputing the misconduct found at the Section 75 proceeding, he would have been able to prevail only by carrying the heavier burden of showing that, notwithstanding his misconduct, the proscribed reasons played a substantial part in his termination. In these circumstances, I think there is a real likelihood that the preclusion errors affected the outcome of this trial.

8

In concluding otherwise, the majority states that it is highly unlikely that a jury would have discredited the charged misconduct because (1) Matusick was "thoroughly and effectively cross-examined" on his denials; (2) defendants offered persuasive evidence of the misconduct; (3) Matusick admitted to having blocked a workplace security camera, misconduct that was the subject of an earlier Section 75 proceeding resulting in a 60-day suspension; (4) Matusick's counsel effectively admitted his client's misconduct in arguing that other ECWA employees were not terminated for comparable or worse misbehavior; and (5) the jury finding that Mendez was not individually liable for wrongful termination made it "unlikely that the jury credited Matusick's testimony that he had not committed misconduct justifying termination." Ante at 41–43. I am not convinced.

Specifically, I cannot agree that the noted preclusion errors were necessarily neutralized by defendants' opportunity to cross-examine Matusick and to put on evidence supporting the misconduct charges. Indeed, such a conclusion is at odds with our obligation, on the appeal of a judgment following a jury verdict, "to view the facts of the case in the light most favorable to the prevailing party." Kosmynka v. Polaris Indus., Inc., 462 F.3d 74, 77 (2d Cir. 2006). When the evidence is so viewed, we must assume that the jury credited Matusick's disavowal of workplace

9

misconduct and, accordingly, found no misconduct basis for termination. Such findings made it easier for Matusick to carry his trial burden than would have been the case if he had properly been precluded from disputing already-adjudicated misconduct and if the jury had been correctly instructed in this regard.

Nor is a different conclusion warranted because Matusick's counsel argued that other employees were not terminated for misconduct worse than that attributed to his client. I respectfully submit that such an argument does not effectively admit misconduct on its face, much less in context. At most, it tells the jury that defendants' discriminatory intent in terminating him for unwarranted charges of misconduct is <u>further</u> evidenced by the fact that employees actually guilty of comparable or worse misconduct were not terminated. Before referencing any comparators, counsel made Matusick's position plain: he was not sleeping on the job on October 1, and his conduct on October 20 reflected a reasonable exercise of judgment. <u>See</u> J.A. 2924–26. Thereafter, he urged the jury to give no weight to arguments referencing the administrative tribunal, which he dismissed as "a kangaroo court," though its misconduct findings should have bound him. J.A. 2932.

Finally, I cannot agree that the verdict in favor of Mendez, the supervisor who made the final termination decision, means that the jury rejected Matusick's

10

disavowal of workplace misconduct. See ante at 42–43. Indeed, such a conclusion is undermined by the majority's own reasoning in elsewhere reconciling the jury's decision that ECWA was liable for wrongful termination even though Mendez was not. In this regard, the majority submits that the misconduct charges against Matusick could have been "tainted" by racial animus. Ante at 46. But it would be far easier for Matusick to prove that "taint" if he could persuade the jury that the charges were false than if the jury were required to accept them as proved. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. at 149; James v. N.Y. Racing Ass'n, 233 F.3d at 155. Because Matusick's trial strategy was to argue falsity, consistent with our obligation to view the evidence in the light most favorable to him as the prevailing party, we must assume that the jury made the finding that he urged. Thus, because Matusick was precluded from arguing, and the jury was precluded from finding, that the misconduct charges were false, the preclusion errors here cannot be deemed harmless.

Accordingly, I would vacate the judgment in favor of Matusick on his racially discriminatory termination claims and order a new trial.

11

2.      Matusick's Constitutional Claim of Intimate Association

   a.      Matusick's Failure To Pursue an Obvious Constitutional Claim for Race Discrimination Under the Equal Protection Clause

At its core, this is a case about race discrimination.  As the majority opinion details, Matusick, who is white, was subjected to co-worker abuse because of his relationship with an African-American woman, Anita Starks.  Such racial harassment not only supported Matusick's hostile-work-environment claim under New York law, but also would have supported a parallel claim under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment's Equal Protection Clause.  See U.S. Const. amend. XIV.  Moreover, the harassment would have supported such a constitutional claim without any inquiry into the particulars of the Matusick-Starks relationship. Whether Starks was Matusick's fiancée, his next-door neighbor, or just a casual friend, if defendants took adverse action against Matusick because this white man associated with an African-American woman, the conduct violated equal protection.  See Bob Jones Univ. v. United States, 461 U.S. 574, 605 (1983) (observing that precedent "firmly establish[es] that discrimination on the basis of racial affiliation and association is a form of racial discrimination"); see also Holcomb v. Iona College, 521 F.3d 130, 139 (2d Cir. 2008) (holding, under Title VII, that where

12

employee is subjected to adverse action because "employer disapproves of interracial association, the employee suffers discrimination because of the employee's <u>own</u> race" (emphasis in original)); <u>DeMatteis v. Eastman Kodak Co.</u>, 511 F.2d 306, 312 (2d Cir. 1975) (concluding that white plaintiff had standing under 42 U.S.C. § 1981 to sue employer for taking adverse employment action against him in reprisal for selling house to African-American person); <u>Rosenblatt v. Bivona & Cohen, P.C.</u>, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) (concluding that white plaintiff had standing to sue under § 1981 for termination motivated by marriage to African-American woman).

For reasons that the majority aptly describes as "perplexing," <u>ante</u> at 64, Matusick did not pursue a violation of equal protection at trial. He sought § 1983 relief only for violation of the right to intimate association, even as he relied exclusively on evidence of racial harassment to prove that violation. While the nature of Matusick's relationship with Starks would have been irrelevant to an equal protection claim based on such harassment, it was critical to his intimate association claim.

13

b.    The Majority's Recognition of an Intimate Association Right in Betrothal

The majority identifies the constitutionally protected right at issue as one of "betrothal."  To the extent Matusick and Starks were engaged, there is precedent suggesting that their choice of each other as <u>marital</u> partners might claim constitutional protection under the Due Process Clause, if not also under a First Amendment right of intimate association.  <u>See</u> <u>Roberts v. U.S. Jaycees</u>, 468 U.S. 609, 620 (1984) ("[T]he Constitution undoubtedly imposes constraints on the State's power to control the selection of one's spouse.")[3]; <u>Loving v. Virginia</u>, 388 U.S. 1 (1967) (holding that state prohibition on interracial marriage violated both equal protection prohibition against race discrimination and due process right to marry); <u>Adler v. Pataki</u>, 185 F.3d 35, 42 (2d Cir. 1999) (observing that whenever Supreme Court has considered impairment of "most fundamental of intimate relationships, marriage, it has not spoken generally of right of intimate association, but has referred specifically to a right to marry and has grounded that right on the liberty protected by the Due Process Clause").

---

[3] In <u>Roberts</u>, the Supreme Court recognized the "right of association" to have two components, one relating to association with others for expressive purposes protected by the First Amendment, the other relating to intimate association, <u>see</u> 468 U.S. at 617–18.  Language in <u>Roberts</u>, and the authorities cited therein, suggest that the right derives from the personal liberty protected by the Due Process Clause.  <u>Id.</u>; <u>see</u> <u>Adler v. Pataki</u>, 185 F.3d 35, 42 (2d Cir. 1999).

14

Whatever the constitutional source of the right of intimate association in betrothal recognized by the majority today, I agree that it was not so clearly established at the time of the events at issue to support the individual defendants' liability for infringing that right through the creation of a hostile work environment. I thus join in the decision to dismiss Matusick's constitutional claim against the individual defendants on the ground of qualified immunity.

Qualified immunity does not extend to Matusick's municipal employer, the ECWA. See Owen v. City of Independence, 445 U.S. 622, 650 (1980); Monell v. N.Y.C. Dep't of Soc. Servs., 436 U.S. 658, 701 (1978). My colleagues in the majority uphold the intimate association judgment against that defendant, concluding that the evidence was sufficient to admit a jury finding that Matusick sustained pervasive verbal and physical harassment "on the basis of his intimate association with Starks [that] rose to the level of a custom, policy, or practice at the ECWA." Ante at 71. While I recognize that we can affirm for any reason that finds support in the record, see 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 125 (2d Cir. 2011), I cannot join my colleagues in concluding that the record here admits a finding of an ECWA custom or practice to violate employees' intimate association right in betrothal.

15

c. Betrothal Was Not Here Identified as the Protected Intimate Association

Insofar as the majority recognizes betrothal as the intimate association here at issue, I am not persuaded that this case was presented to the jury on the theory that betrothal was the specific protected relationship violated. To be sure, in his opening statement to the jury, Matusick's counsel stated that his client's "termination was a form of discrimination because of his relationship with his wife who was at that time his fiancée." J.A. 1894 (emphasis added). Even assuming this is enough to identify betrothal as a protected relationship, the jury did not find that Matusick had been terminated based on intimate association. Rather, it found him terminated on the basis of racial bias. With respect to the hostile work environment that informs the jury's intimate association judgment, counsel did not link that injury to the fact of the couple's engagement—as distinct from their relationship generally. In his opening statement, counsel asserted that Matusick was subjected to repeated racial epithets simply because he had "fall[en] in love with an African American woman," making no mention of what intimate association the couple had formed that warranted constitutional protection. J.A. 1892. Indeed, counsel stated that Matusick's co-workers made plain that their harassment was prompted by his client "hanging around" with blacks, that "[w]hite people shouldn't hang around

16

with [blacks]," and that Matusick "should stay away from the [blacks]." J.A. 1893.[4] This suggested that Matusick was subjected to a racially hostile work environment because he maintained <u>any</u> relationship with an African American woman, not specifically because that relationship was a betrothal. As I have already noted, the Equal Protection Clause would proscribe a hostile work environment based on race without regard to the couple's precise relationship, but the same conclusion does not obtain with respect to the right of intimate association.

Nor did counsel's summation or the court's charge clarify that betrothal was the intimate association supporting Matusick's constitutional claim. To the contrary, counsel repeatedly referenced Starks as Matusick's "girlfriend," rather than as his "fiancée," and stated that Matusick was discriminated against "because he was dating and then became engaged to an African American woman," drawing no constitutional distinction between the two phases of the couple's relationship. J.A. 2905, 2915, 2934–35.[5] In discussing infringement, counsel did reference engagement

---

[4] In the quoted excerpts, I have substituted the word "blacks" for the racial epithet that counsel ascribed to Matusick's harassers. <u>See</u> <u>ante</u> 8 n.3.

[5] This conflation persists in Matusick's brief on appeal, which maintains that "the right to intimate association extends to all highly intimate family relationships, including a dating/fiancée relationship." Appellee's Br. 47; <u>see</u> <u>Webster's New World Dictionary</u> 1491(3d ed. 1986) (defining "virgule" as "short diagonal line (/) used between two words to show either is applicable (and/or). . . .").

17

and marriage: "It is not required that the defendants interfere with the relationship itself. They do not need to have broken up the marriage or caused the engagement to be broken off [ ] to cause harm." J.A. 2934. But that negative point hardly made clear to the jury that the couple's betrothal was the critical fact supporting a constitutional claim of intimate association.

Indeed, the district court did not so charge the jury. It instructed as follows:

Freedom of association includes the right to enter into and maintain certain intimate human relationships, such as a relationship that plaintiff shared with his then-girlfriend Anita Starks. . . This right can be violated if someone is penalized for those — for who the other person is in a relationship.

J.A. 3008–09. The fact that the court referred to Starks as Matusick's "girlfriend"—not his "fiancée"—can reasonably be understood to signal that the constitutional claim did not depend on the couple's betrothal. That conclusion is only reinforced by the instruction that the right of intimate association can be violated by penalizing someone "for who the other person is in a relationship," rather than by penalizing someone "for his choice of whom to marry."

d. <u>The Record Does Not Admit a Finding of Municipal Liability for Violation of the Intimate Association Right in Betrothal</u>

In any event, the record does not admit a finding that ECWA had a policy, practice, or custom of violating employees' intimate association right in betrothal.

18

The law recognizes that, even in the absence of a professed unconstitutional policy, a municipality may be liable for the unconstitutional practices of its subordinates where those practices are "so persistent and widespread" in the workplace "as to practically have the force of law," Connick v. Thompson, 131 S. Ct. 1350, 1359 (2011), "or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses," Jones v. Town of E. Haven, 691 F.3d 72, 81 (2d Cir. 2012). The majority concludes that the jury could have found an unconstitutional custom or policy here from evidence that Matusick complained to various supervisors about persistent harassment by co-workers, that supervisors failed to take remedial action, and that at least one of those supervisors—Mendez—knew that Matusick and Starks were engaged. See ante at 71–73. I cannot agree. Where municipal liability is based on employer inaction, "rigorous standards of culpability and causation must be applied" to ensure against vicarious liability. Board of the Cnty. Comm'rs v. Brown, 520 U.S. 397, 405 (1997); accord Connick v. Thompson, 131 S. Ct. at 1365; Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007). Matusick did not satisfy these standards.

As the majority itself recognizes, the pervasive harassment that Matusick experienced was racial. See ante at 46. The record does not indicate that Matusick complained or that ECWA would otherwise have known, that such racial

19

harassment was caused by his engagement to marry Starks.[6] The latter motivation, and ECWA's knowledge of it, would appear necessary to support a conclusion that ECWA had a custom or practice of violating its employees' rights of intimate association, and not only their rights of equal protection. See City of St. Louis v. Prapotnick, 485 U.S. 112, 127 (1988) (stating that if authorized policymakers approve subordinate's decision "and the basis for it," their ratification is chargeable to municipality); Green v. City of New York, 465 F.3d 65, 80 (2d Cir. 2006) (referencing municipality's practice to engage in "constitutional violation at issue"); Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 128 (2d Cir. 2004) (Sotomayor, J.) (observing that plaintiff must establish that policymaking official had notice of potentially serious problem of unconstitutional conduct, such that need for corrective action or supervision was obvious). While Starks testified that Mendez knew of the couple's engagement, that knowledge does not by itself equate to knowledge that Matusick was being harassed because the couple planned to marry. Indeed, as already noted, Matusick's counsel argued to the jury that the harassment

------

[6] The record does indicate one log entry in which Matusick complained that co-worker Finn was making disparaging comments about him, his father, and his family. While Matusick testified that he considered Starks and her children his "new family," he did not so state in his complaint, much less did he indicate that the couple was engaged and that the disparagement was informed by that relationship.

20

was prompted by the fact that the couple had any relationship at all, circumstances that would have supported an equal protection claim but not necessarily one based on an intimate association right in betrothal.

Further, insofar as the panel unanimously affords Mendez qualified immunity as an individual because his obligation to stop racial harassment as a violation of the intimate association right of betrothal was not then clearly established, it seems curious to conclude that <u>his</u> failure to stop the harassment is an adequate basis for identifying an ECWA custom or practice of violating its employees' rights of intimate association. <u>See</u> <u>ante</u> at 72–73; <u>see also</u> <u>City of Canton v. Harris</u>, 489 U.S. 378, 388 (1989) (holding that official's inaction must demonstrate "deliberate choice"). Indeed, precedent signals caution in reaching such a municipal liability conclusion. This court has held that where a municipal liability claim is grounded in an employer's deliberate indifference to the unconstitutional actions of its employees, the constitutional right at stake has to be "clearly established." <u>Townes v. City of New York</u>, 176 F.3d 138, 143–44 (2d Cir. 1998); <u>Young v. County of Fulton</u>, 160 F.3d 899, 904 (2d Cir. 1998). The Eighth Circuit recently cited approvingly to <u>Townes</u> and <u>Young</u> in reaching the same conclusion <u>en banc</u>. <u>See</u> <u>Szabla v. City of Brooklyn Park</u>, 486 F.3d 385, 393 (8th Cir. 2007). As that court explained, requiring that a constitutional right be clearly established to support a claim of deliberate

21

indifference "is not an application of qualified immunity for liability flowing from an unconstitutional policy. Rather, the lack of clarity in the law precludes a finding that the municipality had an unconstitutional policy at all, because its policymakers cannot properly be said to have exhibited a policy of <u>deliberate</u> indifference to constitutional rights that were not clearly established." <u>Id.</u> at 394 (emphasis in original). While these deliberate indifference cases arise in the context of failures to train or supervise rather than failure to investigate or discipline, what is common to all these circumstances is employer inaction. And as the Eighth Circuit has persuasively explained in <u>Szabla</u>, for inaction of any sort to reflect "<u>deliberate</u> indifference to constitutional rights," the right must be established. To conclude otherwise is to ignore the rigorous standards of culpability and causation that, as I earlier noted, the Supreme Court has mandated for municipal liability based on deliberate indifference to employees' constitutional violations. <u>See</u> <u>Board of the Cnty. Comm'rs v. Brown</u>, 520 U.S. at 405; <u>see</u> <u>Reynolds v. Giuliani</u>, 506 F.3d at 192 (holding that rigorous standards apply to "broad range of supervisory liability claims" including failure to supervise and to discipline, as well as to train).

Here, there was a clearly established constitutional right at stake: the right of equal protection. Thus, to the extent Mendez, or other ECWA supervisors, failed to investigate and stop the persistent <u>racial</u> harassment to which they knew Matusick

22

was being subjected, ECWA might well have been found liable for deliberate indifference had that clearly established federal right been asserted. But I am not convinced simply from the fact that Mendez knew that Matusick and Starks were engaged that his failure to stop the racial harassment supports holding ECWA liable for an employer custom and practice of violating employees' rights of intimate association in betrothal.

e.   The Law Does Not Warrant Extension of the Right of Intimate Association to Romantic Relationships Generally

Even if I were convinced that Matusick had demonstrated an ECWA custom or practice of interfering with employees' choices of whom to marry, I would not be able to join in the majority opinion. While my colleagues are careful to identify betrothal as the intimate association at issue, certain language in the opinion could be read to imply that the right reaches more broadly to protect a variety of (unidentified) romantic relationships. See ante at 58–61, 60 n.18. Such a suggestion is at best dictum, but it is dictum in which I cannot join.

In recognizing a right of intimate association, as distinct from a right of expressive association, the Supreme Court explained that the former shields "the formation and preservation of certain kinds of highly personal relationships" from unjustified state interference. Roberts v. U.S. Jaycees, 468 U.S. at 618 (emphasis

23

added). In short, not every highly personal relationship can claim the constitutional protection of intimate association, only "certain kinds." While the Supreme Court has declined to identify "every consideration that may underlie this type of constitutional protection," id., it has stated that the "kinds of highly personal relationships" warranting constitutional protection are those that "have played a critical role in the culture and traditions of the Nation by cultivating and transmitting shared ideas and beliefs," in the process "foster[ing] diversity and act[ing] as critical buffers between the individual and the power of the State." Id. at 618–19. "[T]he constitutional shelter afforded such relationships reflects the realization that individuals draw much of their emotional enrichment from close ties with others." Id. at 619 (emphasis added) (observing that affording constitutional protection to "these relationships . . . safeguards the ability independently to define one's identity that is central to any concept of liberty" (emphasis added)). As the highlighted language indicates, while the highly personal relationships warranting intimate-association protection characteristically foster personal identity and provide emotional enrichment, not every personal relationship that does so is constitutionally protected. The considerations underlying extension of intimate-association protection to "such relationships" relate to the "critical role" they play "in the culture and traditions of the Nation," as described by Roberts. Id. at 618–19.

In <u>Roberts</u>, the Supreme Court identified "[t]he personal affiliations that exemplify these considerations, and that therefore suggest <u>some relevant limitations</u> on the relationships that might be entitled to this sort of constitutional protection." <u>Id.</u> at 619 (emphasis added). These affiliations are "those that attend the creation and sustenance of a family," specifically, "marriage, childbirth, the raising and education of children, and cohabitation with one's relatives." <u>Id.</u> (citations omitted). The Court observed that such "[f]amily relationships, by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." <u>Id.</u> at 619–20. Such family relationships are also "distinguished by such attributes as relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." <u>Id.</u> at 620. Insofar as betrothal reflects a proclaimed promise (if no longer an enforceable contract) to marry,[7] it might be said to attend the formal creation of a family and, thus, to play a critical role in the transmittal of the nation's culture and traditions.

The majority, however, suggests that intimate association might reach further

---

[7] <u>See</u> N.Y. Civ. Rights Law § 80-a (abolishing cause of action for breach of promise to marry); <u>Fearon v. Treanor</u>, 272 N.Y. 268, 5 N.E.2d 815 (1936) (upholding statute as constitutional), <u>appeal dismissed</u>, 301 U.S. 667 (1937).

because <u>Roberts</u> did not specifically cabin the right of intimate association to family relationships, <u>see</u> <u>Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte</u>, 481 U.S. 537, 545 (1987) (noting that Supreme Court has "not held that constitutional protection is restricted to relationships among family members"), and our own court has disclaimed any "categorical approach . . . [to] association-rights cases," <u>Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y.</u>, 502 F.3d 136, 144 (2d Cir. 2007). True enough. But neither the Supreme Court nor this court has thus far recognized the right of intimate association to apply outside the context of families, whether defined by blood or law. <u>See also</u> <u>Poirier v. Mass. Dep't of Corr.</u>, 558 F.3d 92, 96 (1st Cir. 2009) (upholding dismissal of intimate association claim by prison guard fired for romantic relationship with former inmate, holding that "unmarried cohabitation of adults does not fall within any of the Supreme Court's bright-line categories for fundamental rights"); <u>but see</u> <u>Fair Hous. Council of San Fernando Valley v. Roommate.com</u>, LLC, 666 F.3d 1216, 1222 (9th Cir. 2012) (construing anti-discrimination provisions of federal and state fair housing laws not to apply to shared living quarters to avoid possible intrusion on intimate association rights of roommates). At a minimum, this signals caution in expanding the right based simply on analogous descriptive characteristics.

26

Certainly, Roberts does not suggest that any small, select, and secluded association—a description that might well fit some criminal enterprises—can claim constitutional protection. Rather, Roberts instructs that "[a]s a general matter, only relationships with these sorts of qualities" are "likely to reflect the considerations" warranting constitutional protection for intimate associations. Roberts v. U.S. Jaycees, 468 U.S. at 620. Thus, Roberts's descriptive characteristics establish a useful objective standard for identifying entities—like the Jaycees—whose size and openness preclude them from claiming intimate-association protection. See also Board of Dirs. of Rotary Int'l v. Rotary Club of Duarte, 481 U.S. at 547 (holding Rotary Club not protected by right of intimate association). Indeed, this court has used Roberts's descriptive characteristics in this way, to reject intimate association claims in various contexts. See Piscottano v. Murphy, 511 F.3d 247, 278–80 (2d Cir. 2007) (rejecting claim by corrections officers disciplined for gang association); Chi Iota Colony of Alpha Epsilon Pi Fraternity v. City Univ. of N.Y., 502 F.3d at 147 (rejecting intimate association claim by fraternity wishing to continue excluding women without forfeiting university recognition); Sanitation Recycling Indus., Inc. v. City of New York, 107 F.3d 985, 995–96 (2d Cir. 1997) (rejecting intimate association claim by carting companies challenging restrictive licensing scheme).

27

Neither the Supreme Court nor this court, however, has afforded intimate association protection based solely on a finding of small size, selectivity, and seclusion. Such a preliminary finding might allow the intimate association inquiry to continue, but it does not conclusively resolve it. The inquiry process is necessarily holistic given "the broad range of human relationships that may make greater or lesser claims to constitutional protection from particular incursions by the State," Roberts v. U.S. Jaycees, 468 U.S. at 620 (noting that factors relevant to intimate association inquiry include "size, purpose, policies, selectivity, congeniality, and other characteristics that in a particular case may be pertinent"). Moreover, it contemplates a "careful assessment of where the relationship's objective characteristics locate it on a spectrum from the most intimate to the most attenuated of personal attachments." Id. But the ultimate point of the inquiry is not simply to draw descriptive analogies. Rather, I understand the inquiry's ultimate purpose to be identifying those highly personal relationships that exemplify the considerations underlying the constitutional protection for intimate association. As thus far identified by the Supreme Court, those considerations relate to the critical role that certain highly personal relationships have played in the "culture and traditions of the Nation." Id. at 618–19. Betrothal may satisfy this criteria, but I am not inclined

to speculate that other relationships that fail to do so can also claim constitutional protection.

In explaining why I dissent from the majority's decision to uphold ECWA's liability for violating Matusick's right of intimate association, a final point is noteworthy: the practical beneficiary of the court's decision is not Matusick, but only his attorney. Although the jury awarded Matusick $5,000 in punitive damages from each of the individual defendants found liable on the intimate association claim, the panel today reverses that judgment on the ground of qualified immunity. And while the majority affirms the intimate association judgment against ECWA, the jury awarded Matusick no compensatory (or even nominal) damages against that defendant. Thus, the practical effect of today's decision with respect to the intimate association claim is not to compensate Matusick for infringement of any constitutional right, but only to allow his lawyer to recover attorney's fees for pursuing a dubious constitutional claim of association instead of an obvious one of equal protection. See 42 U.S.C. § 1988.

\* \* \*

To conclude, I concur in the court's decision to affirm the judgment for Matusick on his state law claim of a racially hostile work environment. I also concur in the decision to dismiss Matusick's federal intimate association claim against

individual defendants on the ground of qualified immunity. For the reasons stated in this opinion, however, I respectfully dissent from the majority decision to affirm the judgment for Matusick on his state wrongful termination claim and his federal intimate association claim against ECWA.

LOHIER, Circuit Judge, concurring:

I agree with the majority opinion, including its fact-specific determination that the engagement relationship between Scott Matusick and his fiancée, Anita Starks, is the type of intimate association protected by the First Amendment. I write separately to emphasize that Matusick's arguments at trial focused on the defendants' efforts to interfere with that relationship and to make clear that the engagement relationship is entitled to constitutional protection because it has played a "critical role in the culture and traditions of the Nation" since the founding. Roberts v. U.S. Jaycees, 468 U.S. 609, 618-19 (1984).

As an initial matter, the dissent acknowledges that Matusick and Starks's "choice of each other as marital partners" may be protected by the intimate association right, Dissenting Op., post, at 14 (emphasis omitted), but states that Matusick did not present his case "on the theory that betrothal was the specific protected relationship violated," id., post, at 16. First, I discern no constitutional difference between undermining a person's choice of marital partner and interfering with a betrothal relationship. Second, I disagree with the dissent's characterization of Matusick's position at trial. The heart of Matusick's argument was that defendants tried to interfere with his engagement relationship. Throughout their jury addresses, Matusick's attorneys stressed that "Matusick's

termination was a form of discrimination because of his relationship with his wife who was at that time his fiancee," Joint App'x at 1894, and that "Matusick was a victim of discrimination because he was dating and then became engaged to an African American woman," Joint App'x at 2905. At trial, moreover, Starks testified that Matusick "acknowledged me as his fiancee" at work and introduced her as his fiancée to his supervisor, Robert Mendez. Joint App'x at 1906-07; see Joint App'x at 2101 (Matusick confirming that he told coworkers that he was engaged and introduced Stark to some coworkers). The couple described to the jury how they fell in love and became engaged.

Although the Court in Roberts did not list engagement relationships in its non-exclusive roster of "highly personal relationships" that "might be entitled to . . . constitutional protection," 468 U.S. at 618-19, such relationships surely qualify. There is virtually no doubt that the engagement relationship between Matusick and Starks is one that the Framers would have recognized (setting aside, of course, the issue of miscegenation). Indeed, engagement as a social practice and a legally recognized relationship status predates the founding. In colonial times, the English law of "spousals" recognized "spousals de futuro" – in essence, betrothals – as a well-established form of contract that could be simple

2

or conditional, public or private, and binding upon children and adults alike. <u>See</u> <u>Wightman v. Coates</u>, 15 Mass. 1, 6 n.a (1818) (reviewing the enforceability of marriage promises under the laws of various European nations). <u>See generally</u> Henry Swinburne, <u>A Treatise of Spousals, or Matrimonial Contracts </u>(1686); Chester Francis Wrzaszczak, <u>The Betrothal Contract in the Code of Canon Law</u> <u>(Canon 1017)</u> 183-86 (1954). While spousals <u>de</u> <u>futuro</u> were the custom in early colonial New England, <u>see</u> Chilton L. Powell, <u>Marriage in Early New England</u>, 1 New Eng. Q. 323, 327 (1928), the modern social form of engagement replaced formal betrothal customs "after a few years of life in the New World," Alice Morse Earle, <u>Old-Time Marriage Customs in New England</u>, 6 J. Am. Folklore 97, 101 (1893).

By the later 1700s American middle-class social practice with respect to marriage involved "courting"— sustained social interaction between the sexes in parents' parlours, community gatherings, group or couples' outings, and through written correspondence. <u>See, e.g.,</u> Ellen K. Rothman, <u>Hands and Hearts: A</u> <u>History of Courtship in America</u> 22-26 (1984); <u>see also</u> Anya Jabour, <u>Marriage in</u> <u>the Early Republic</u> 13-14 (1998). The key transition from courting to engagement involved the exchange of promises between the engaged. <u>See, e.g.,</u> Rothman,

<u>Hands and Hearts</u>, at 33-35. Couples would date their engagements from the moment of that exchange, and they treated the mutual promises as momentous. <u>See, e.g.</u>, Jabour, <u>Marriage in the Early Republic</u>, at 18. Engagements could last for an extended period of time. <u>See</u> Rothman, <u>Hands and Hearts</u>, at 57-75. Social acknowledgment of an engagement varied, but a private announcement to family was common, and the promise itself was nearly universal. Engaged and married couples today will recognize many, if not all, of these attributes.

Engagement promises carried legal and economic as well as social significance. American courts recognized the important status of engagement and during the eighteenth century began to develop a civil cause of action for breach of promise. These actions permitted a woman whose engagement promise was breached to recover from a (former) fiancé and were available in almost all of the States into the twentieth century. <u>See</u> Rebecca Tushnet, <u>Rules of Engagement</u>, 107 Yale L.J. 2583, 2586-88 (1998); Robert C. Brown, <u>Breach of Promise Suits</u>, 77 U. Pa. L. Rev. 474, 474-75 (1929). Early American courts did not require formal indicia of engagement, holding instead that "young persons['] . . . mutual engagements [could be] inferred from a course of devoted attention and

4

apparently exclusive attachment, which is now the common evidence."

Wightman, 15 Mass. at 5.

For these reasons I think there is no question that the engagement relationship in general and in this case is a "highly personal relationship" entitled to constitutional protection.